IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

STEPHEN WESTLEY HATFIELD,

       Petitioner,

v.                                             **Case No. 3:09-cv-0119**

LARRY PARSONS, Administrator,
Western Regional Jail,

       Respondent.

## PROPOSED FINDINGS AND RECOMMENDATIONS

Pending before the Court is Petitioner's Petition for Writ of Habeas Corpus by a Person in State Custody (Docket No. 1), Respondent's Motions for Summary Judgment (Docket Nos. 7 and 19), and Petitioner's Cross-Motion for Summary Judgment (Docket No. 28). This matter is assigned to the Honorable Robert C. Chambers, United States District Judge and, by Standing Order, has been referred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

Stephen Westley Hatfield ("Hatfield") brings this petition for a writ of habeas corpus under 28 U.S.C. § 2254 following his 1989 convictions in the Circuit Court of Wayne County, West Virginia of one count of first degree murder and two counts of malicious wounding. Hatfield presently is incarcerated at Mount Olive Correctional Complex, serving a sentence of life imprisonment without mercy and

two concurrent sentences of two to ten years imprisonment.[1] Hatfield raises the following grounds, which emanate from a judicial determination of competency made prior to Hatfield's entry of guilty pleas on all three counts:

1.   Petitioner was not mentally competent at the time his original guilty plea was entered;

2.   Petitioner was denied a full evidentiary hearing on the issue of his mental competency, where witnesses would have testified under oath, Petitioner could have presented evidence to support his defense, and Petitioner could have cross-examined and otherwise confronted the witnesses on this critical issue; and

3.   Petitioner was denied a full evidentiary hearing on the issue of his criminal responsibility, where witnesses would have testified under oath, Petitioner could have presented evidence to support his defense and Petitioner could have cross-examined and otherwise confronted the witnesses on this critical issue.

The record reflects that Hatfield's competency to stand trial was in question from the outset; however, he was never afforded a reasonable opportunity to demonstrate that he was not competent. Moreover, when the competency issue was considered on remand, Hatfield again was denied a competency hearing and was prevented from entering a modified plea of not guilty. For the reasons that follow, the undersigned finds that these errors violated Hatfield's constitutional right to procedural due process of law. Accordingly, the undersigned recommends that the presiding District Judge grant Hatfield's motion for summary judgment; deny Respondent's motion for summary judgment; grant Hatfield's request for a

---

[1] On February 10, 2009, when Hatfield filed this petition for writ of habeas corpus, he was incarcerated in the Western Regional Jail. During the pendency of the action, Hatfield was transferred to the Mount Olive Correctional Complex. (Docket No. 29 at 4). Accordingly, David Ballard, Warden of the Mount Olive Correctional Complex, is the properly named Respondent.

writ of habeas corpus; set aside his convictions and discharge him unless the State elects to timely retry him.

## I.      **Factual Background**

On May 8, 1988, Hatfield drove to the Wayne County home of his former girlfriend, Tracey Andrews, and fatally shot her. In the course of committing this crime, Hatfield also shot and wounded Ms. Andrews' boyfriend, Dewey Meyers, and her neighbor, Roger Cox.[2] Following the shootings, Hatfield fled the scene and was eventually arrested by law enforcement officers after an exchange of gunfire. Police shot Hatfield five times in the abdomen and leg before managing to capture and disarm him. (Docket No. 28–2 at 3). As a result of his wounds, Hatfield was hospitalized at Cabell Huntington Hospital and underwent emergency surgery. (*Id.* at 2–3). During his post-operative course, Hatfield attempted suicide by slashing his wrists and endeavoring to strangle himself with his central venous pressure catheter. (*Id.* at 3). Consequently, his attending physician consulted the services of Dr. Johnnie L. Gallemore, Jr., a Marshall University psychiatrist and a member of the hospital's medical staff. Dr. Gallemore examined Hatfield and diagnosed him with severe depression of approximately two months duration. According to Dr. Gallemore, Hatfield was seriously ill and remained a suicide risk. (Docket No. 7-2 at 113). Dr. Gallemore initiated treatment and continued to care for Hatfield until his discharge from the hospital on June 4, 1988. Upon discharge, Hatfield was taken into custody by the Wayne County Sheriff's Department to face charges

---

[2] Both parties agree that the essential facts relevant to the present case are discussed in three decisions by the West Virginia Supreme Court of Appeals involving Petitioner: *State v. Hatfield*, 413 S.E.2d 162 (W. Va. 1991); *State v. Hatfield*, 522 S.E.2d 416 (W. Va. 1999); and *Hatfield v. Painter*, 671 S.E.2d 453 (W. Va. 2008). Hereinafter, these cases will be referred to as "*Hatfield I*," "*Hatfield II*," and "*Hatfield III*," respectively.

related to the shootings. A Wayne County Grand Jury ultimately returned a three count indictment against Hatfield, charging him with one count of first degree murder and two counts of malicious wounding.

### Hatfield's Commitment for Psychiatric Treatment and Evaluation

Shortly after Hatfield's release from Cabell Huntington Hospital, his defense counsel moved to have Hatfield hospitalized so that he could continue to receive psychiatric treatment. On June 10, 1988, the Honorable Robert G. Chafin, Judge of the Circuit Court of Wayne County, conducted a hearing on the motion. (Docket No. 7–2 at 109-143). At the hearing, Dr. Gallemore was called to testify regarding Hatfield's suicide attempt in the hospital, the diagnosis of major depressive disorder, and Hatfield's need for continued treatment. (*Id.* at 110–115). Following this testimony, Judge Chafin granted the motion and committed Hatfield to Weston State Hospital "for examination, treatment and care for a period that is necessarily required for his psychiatric needs." (Docket No. 28–3). The Court further ordered that an examination be performed at Weston State Hospital to determine, in relevant part, Hatfield's mental competency at the time of the alleged crimes and his competency to stand trial. (*Id.*)

During Hatfield's commitment to Weston State Hospital, his competency was evaluated by Dr. Herbert C. Haynes, a psychiatrist, and Earnest Watkins, M.A., a licensed psychologist. On August 1, 1988, Dr. Haynes issued a twelve-page forensic evaluation in which he chronicled Hatfield's emotional collapse. (Docket No. 25-9). Piecing together the events through a series of interviews with Hatfield, Dr. Haynes recounted Hatfield's story as follows: Hatfield was a long-term employee of the United States Post Office and Vice-President of the Postal Workers

Union. He lived with the victim, Ms. Andrews, for a period of four years during which he supported her through beauty school and then the start of nursing school. Hatfield described their lives as perfect. On the Friday before April 1, 1988, Ms. Andrews told Hatfield that she was going out with a girlfriend. She did not return home until Saturday night. When she arrived, she told Hatfield that she was in love with another man, Dewey Meyers. According to Hatfield, that was when "his world came crashing down on his head." At first he did not believe her, but shortly thereafter, Mr. Meyers arrived and loaded some of Ms. Andrews' things in his car and took her away. In the weeks that followed, Hatfield became desolate. He started to drink heavily, although he had never been much of a drinker, and contemplated suicide. He resigned as Vice-President of the Union, because he could no longer think, concentrate, or function. He spent increasing amounts of time alone at home, often pacing from room to room. Hatfield described the month before the shootings as "a daze." He felt like the "most miserable person on earth." On the morning of May 8, 1988, Hatfield called Ms. Andrews' mother to wish her a happy Mother's Day. Ms. Andrews' sister answered the telephone and, upon Hatfield's prodding, confirmed that Ms. Andrews was in love with Mr. Meyers. Hatfield's remaining hopes were crushed. He decided he needed to speak with Ms. Andrews, but was afraid of Mr. Meyers, so he got his gun before driving to Mr. Meyers' home. Once there, he saw Ms. Andrews and asked to speak with her. She announced to Mr. Meyers that Hatfield was there; Hatfield recalled seeing Mr. Meyers running toward him. Hatfield's recollections of the events thereafter were sketchy, but he admitted that he shot Ms. Andrews and the others. After the shootings, Hatfield felt he had nothing to live for and just wanted to die. He

devised a plan to have the police kill him, but he wanted to die at home, so he left the scene. Hatfield explained that he refused to relinquish his gun when the police surrounded him, because he hoped that they would shoot him. When they did not kill him, he tried to kill himself at the hospital. He told Dr. Haynes that if he could take a pill that would make him die, he would gratefully take it, stating "I would welcome not being here . . . it's like going into another world and I can't get back." (*Id.*).

Based upon his interviews and examination of Hatfield, Dr. Haynes diagnosed Hatfield as suffering from Major Depression with an intensely pronounced suicidal component triggered by the grief of his girlfriend leaving him. Dr. Haynes added that although "attempting to arrange one's death by others may seem incomprehensible," Hatfield's plan to have the police kill him was consistent with his intense suicidal intent. Dr. Haynes opined that Hatfield was not competent at the time of the alleged crimes "because of a mental disorder which grossly impaired his ability to conform his conduct to the requirements of the law." (Docket No. 25-9 at 13). Moreover, Dr. Haynes found that Hatfield was not competent to stand trial "[n]ot by reason of his lack of comprehension of criminal proceedings or from any impairment of his intelligence, which is at least above average, but from his Major Depression and intense need for punishment as extreme as death." (*Id.*).

On September 8, 1988, Mr. Watkins issued his forensic evaluation. In this twenty-page report, Mr. Watkins opined that Hatfield was competent to stand trial.  He based his opinions on Hatfield's knowledge of courtroom proceedings and his scores on the Georgia Competency Test and Competency to Stand Trial:

Assessment Instrument. (Docket No. 25-10 at 14). On the issue of competency at the time of the criminal acts, however, Mr. Watkins determined that Hatfield was not competent. He explained that Hatfield had experienced a major depressive episode on the day of the shootings and likely fired the first shot in a self-defense posture. Mr. Watkins concluded as follows:

> Stephen Hatfield experienced at least diminished capacity in terms of his ability to appreciate the wrongfulness of his conduct and/or to conform his conduct to the requirement of the law. Consequently, it is this evaluator's opinion that Stephen Hatfield is not criminally responsible for the crimes with which he has been charged.

(*Id.*).

On September 27, 1988, Hatfield's counsel filed a motion requesting a hearing to determine his mental competency pursuant to W.Va. Code § 27-6A-1 *et seq.*[3] By this time, Judge Chafin had recused himself from the case due to a conflict of interest and a Special Judge, Elliott E. Maynard, was appointed to preside over the matter. At the request of the Wayne County Prosecuting Attorney, Judge Maynard entered an Order on October 12, 1988 requiring Hatfield to be examined by Dr. Ralph S. Smith, Jr., a psychiatrist in South Charleston, West Virginia, for the purpose of determining Hatfield's competency at the time of the crimes and his

---

[3] W.Va. Code § 27-6A-1 (1983) provided in relevant part: (a) Whenever a court of record ... believes that a defendant in a felony case ... may be incompetent to stand trial or is not criminally responsible by reason of mental illness ... it may at any stage of the proceedings after return of an indictment or issuance of a warrant or summons against the defendant, order an examination of such defendant to be conducted by one or more psychiatrists, or a psychiatrist and a psychologist.

W.Va. Code § 27-6A-2 (1983) provided further: (a) At a hearing to determine a defendant's competency to stand trial, the defendant shall be present and he shall have the right to be represented by counsel and introduce evidence and cross-examine witnesses. The defendant shall be afforded timely and adequate notice of the issues of the hearing and shall have access to a summary of the medical evidence to be presented by the state. The defendant shall have the right to an examination by an independent expert of his choice and testimony from such expert as a medical witness on his behalf. All rights generally afforded a defendant in criminal proceedings shall be afforded to a defendant in such competency proceedings.

competency to stand trial. (Docket No. 28–5). A hearing on the issue of Hatfield's competency to stand trial was scheduled for January 27, 1989.

**Competency "Hearing" and After**

On January 27, 1989, Judge Maynard proceeded with the hearing to determine Hatfield's competency to stand trial. (Docket No. 28–6 at 2–9). The transcript of this hearing is eight pages long. (*Id.*). Six of the eight pages document a discussion between the Court, the Prosecuting Attorney, and defense counsel regarding "housekeeping" matters related to the scheduling of the trial and jury selection. (*Id.* at 4–9). The remaining two pages memorialize the competency hearing. (*Id.* at 2–4). No witnesses testified at this hearing; accordingly, there was neither examination nor cross-examination of the mental health care professionals who had examined, evaluated, and treated Hatfield. (*Id.*). The detailed reports prepared by Dr. Haynes and Mr. Watkins were not mentioned. Likewise, no writings or recordings were identified, authenticated, or properly admitted into evidence. Hatfield was not given timely access to or notice of the medical evidence to be presented by the State. He had no opportunity to testify on his own behalf. Instead, the hearing consisted of the Court's review of an unfinished report prepared by Dr. Smith, the prosecution's expert psychiatrist. The report was submitted in letter form addressed to the Prosecuting Attorney; it was dated January 23, 198 [sic] and stated in its entirety:

> My forensic evaluation of your client was completed October 21, 1988. It is my opinion that Mr. Hatfield is competent to stand trial. I am presently reviewing my records to determine whether or not he is criminally responsible. My full report will follow.

(Docket No. 28–10).

After reviewing this letter, Judge Maynard found Hatfield competent to stand trial. He explained his finding as follows:

> Based upon that report and on the facts and circumstances of this case that have been developed in the evidence so far, I will declare the defendant to be competent to stand trial and will order that he stand trial. Show the objection of the defendant to my finding and ruling in that regard.

(Docket No. 28-6 at 4). Hatfield's trial was scheduled to begin on February 27, 1989.

One week after the competency hearing, on February 3, 1989, Dr. Gallemore wrote a letter to defense counsel expressing concern over Hatfield's deteriorating mental health. (*See* Docket No. 28-7 and Docket No. 1 at 17). Dr. Gallemore recommended that Hatfield be hospitalized in a psychiatric inpatient facility where he could receive electric convulsant treatments ("ECT"). Five days later, Hatfield attempted suicide in the Wayne County Jail by taking an overdose of narcotics and antidepressants. (*Id.*)

**Guilty Plea and Sentencing**

Hatfield's trial began as scheduled on February 27, 1989. Immediately before picking a jury, Judge Maynard heard pre-trial motions, including a motion by Hatfield to continue the trial date.[4] (Docket No. 19-3). After Judge Maynard denied the motion, defense counsel advised the Court and Prosecuting Attorney that Hatfield wished to solicit a plea agreement; he wanted to plead guilty to first degree murder in exchange for the Prosecuting Attorney's recommendation of

---

[4] Hatfield's counsel objected to the untimely disclosure of Dr. Smith's final written opinion on Hatfield's competency at the time of the shootings. Defense counsel did not receive the opinion until six days prior to trial and argued that they needed additional time to rebut it.

mercy. At the same time, defense counsel informed the Court that two of Hatfield's psychiatrists felt that Hatfield was not competent to enter a guilty plea. (Docket No. 19-3 at 18-19). Moreover, defense counsel urged Hatfield not to plead guilty, but Hatfield was adamant on entering the plea even against the advice of counsel. (*Id.* at 24).

After allowing the parties an opportunity to discuss a plea agreement, the Court resumed proceedings. According to defense counsel, Hatfield still wished to plead guilty even though the Prosecuting Attorney would not agree to recommend mercy. In an effort to determine if Hatfield was competent to enter a guilty plea, the Court questioned Hatfield at length. (*Id.* at 26–43). Hatfield contended that he was competent and understood the consequences of a guilty plea. The Court then addressed defense counsel, who reiterated that Hatfield's psychiatrists felt Hatfield was not competent to enter a plea. In light of Hatfield's multiple suicide attempts, the psychiatrists feared that entering a guilty plea might simply constitute another attempt at suicide. (*Id.* at 47). Subsequent to these conversations, the Court stated:

> [Hatfield] is competent to enter the plea based on what I've heard here, and notwithstanding — apparently there are psychiatrists going to say opposite things about his competency.
>
> The defendant has some psychologists and/or psychiatrists who are going to say he is not competent. The State has some, or one in particular, who is going to say this man is competent.
>
> I'm not sure that lay judgments of competency aren't better than what the so-called professional gives us . . . I think he's competent to make this decision [to plead guilty] and to make this move and I'm going to attempt to take his plea from him.

(*Id.* at 50.) Accordingly, Hatfield pled guilty to one count of first degree murder and two counts of malicious wounding and was convicted of those crimes by Order

- 10 -

of the Circuit Court entered on March 15, 1989. (Docket No. 7–1 at 5–7).

On December 6, 1989, Judge Maynard conducted a sentencing hearing. (Docket No. 28-13). Hatfield's psychiatrists, Dr. Gallemore and Dr. Haynes, were offered to testify concerning their evaluation, care and treatment of Hatfield. (*Id.* at 2-19). Neither witness was permitted to testify regarding Hatfield's competency. At the conclusion of the hearing, Judge Maynard sentenced Hatfield to life in prison without mercy on the count of murder and two to ten year sentences for the malicious wounding counts, all to be served concurrently. (*Id.* at 10–13).

On December 18, 1989, Dr. Gallemore wrote another letter to defense counsel summarizing his contacts with Hatfield and restating his impression that Hatfield's "choice to plead guilty to charges against him was significantly affected by his illness and that he lacked the capacity on February 27, 1989 to intelligently and knowingly enter a plea of guilty to these charges." (Docket No. 28-7). Dr. Gallemore reiterated his opinion that Hatfield likewise lacked capacity to appreciate the nature of and control of his acts on the day of the crimes.

## II.   <u>Procedural History</u>

The procedural history created in the twenty years between Hatfield's 1989 conviction and his 2009 federal habeas action is complex and tortuous. It is summarized as follows.

### *Hatfield I* - Hatfield's First Direct Appeal to the West Virginia Supreme Court of Appeals

Hatfield filed a petition appealing his conviction and sentence in the Supreme Court of Appeals of West Virginia ("WV Supreme Court") on December 10, 1990. (Docket No. 71- at 15–49). Hatfield argued, *inter alia*, that the trial court

- 11 -

erred by accepting his guilty pleas without first ensuring his competency to stand trial.5 The WV Supreme Court found error in the trial court's acceptance of Hatfield's guilty pleas and remanded the case with instructions. *Hatfield I,* 413 S.E.2d 162, 167 (W.Va. 1991). In particular, the WV Supreme Court expressed concern that Hatfield's guilty pleas were entered after a second attempt at suicide and against the advice of counsel. Citing state and federal case law, the Court observed that "[i]t is a fundamental guaranty of due process that a defendant cannot be tried or convicted for a crime while he or she is mentally incompetent." *Id.* at 169 (citations omitted). The Court recognized that "[g]enuine attempts at suicide constitute evidence of irrational behavior. When these acts are brought to the attention of a trial judge, he should order a psychiatric examination of a

---

5 Hatfield asserted three challenges:

    A.    Whether the court erred in accepting defendant's pleas of guilty as he was incompetent at the time the pleas were entered.

        (1) Whether the court erred in finding the defendant competent under the standards set forth in West Virginia Code, Sections 27-6A-1, 2.

        (2) Whether the court erred in accepting defendant's pleas of guilty without reconsidering defendant's mental competence given the defendant's subsequent attempt at suicide and the additional psychiatric evidence tendered after the court's finding of competence.

    B.    Whether a sufficient factual basis was presented to the court to sustain convictions for murder in the first degree and malicious assault.

        (1) Whether the factual basis presented by the defendant on the charge of first degree murder was sufficient to support defendant's plea.

        (2) Whether the factual basis presented by defendant on the charges of malicious assault were sufficient to support defendant's pleas.

    C.    Whether the court abused its discretion in denying defendant's motion for a continuance to allow receipt of newly available records and to allow enforcement of a subpoena.

defendant." *Id.* at 163, syl. 2 (citations omitted). Citing to its decision in *State v. Cheshire,* 292 S.E.2d 628, 630 (1982), the Court confirmed that "the test for mental competency to stand trial and the test for mental competency to plead guilty are the same;" therefore, the statutory process delineated in W.Va. Code § 27-6A-1 *et seq.* was applicable "to a determination of a defendant's competence to enter a guilty plea." *Id* at syl. 4 (citation omitted).

    Although Hatfield brought the issue squarely before the Court, the WV Supreme Court did not explicitly address the adequacy of the trial court's *original* determination of competency. Instead, the Court merely noted that a competency hearing had taken place on January 27, 1989 and the trial court had found Hatfield competent to stand trial. The Court then shifted its focus to the failure of the trial court to reassess Hatfield's competency during the plea colloquy, stating:

> Where a circuit court has found that a defendant in a criminal case
> where the possible punishment is life imprisonment without mercy is
> competent to stand trial, but subsequent to the competency hearing,
> the defendant attempts to commit suicide, then against advice of
> counsel indicates his desire to plead guilty to the charges in the
> indictment, before taking the plea of guilty, the trial judge should
> make certain inquiries of the defendant and counsel for the
> defendant in addition to those mandated in *Call v. McKenzie,* 159
> W.Va. 191, 220 S.E.2d 665 (1975).

*Id.* at 169. The Court explained that the trial judge should have required defense counsel to state on the record their reasons for opposing Hatfield's guilty pleas and should have confirmed that Hatfield understood the statements of counsel and still wished to plead guilty. Only after the trial judge was convinced of Hatfield's understanding and desire to plead guilty could the court accept the guilty pleas. *Id.*

    On December 19, 1991, the WV Supreme Court issued a mandate order confirming "that there is an error in the judgment of the Circuit Court of Wayne

County, rendered on the 3rd day of January, 1990" and directing that the judgment be "set aside, reversed and annulled" and the case be "remanded to the Circuit Court of Wayne County for further development according to the principles stated and directions given in the written opinion. . ." This order was recorded in the Circuit Court of Wayne County on February 7, 1992. (Docket No. 7–1 at 51).

### *Hatfield II* - Hatfield's Second Direct Appeal to the West Virginia Supreme Court of Appeals

The record is not entirely clear as to what transpired in the following years. A hearing held by Judge Maynard on December 11, 1996 appears to be the first activity in the case after the WV Supreme Court's mandate order. At this hearing, the parties agreed that a psychiatric evaluation of Hatfield's current competency would be appropriate. The trial court, *sua sponte*, also ordered a retrospective review of Hatfield's competency at the time of the 1989 plea hearing. The Court directed that Dr. Ralph Smith, the prosecution's expert, conduct the examination of Hatfield and perform the retrospective review. Hatfield did not object to a current evaluation, but did object to Dr. Smith performing the evaluation and retrospective review. Hatfield was not given the opportunity at that time to select his own expert. (See Docket 7-4 at 39-56). Ultimately, during a second hearing two days later,[6] the trial court decided a current evaluation was "pointless," and neither the examination nor the retrospective review was completed. (See Docket 7-4 at 53). Upon learning that the parties were discussing a plea agreement, the Court canceled the examination, indicating:

---

[6] The transcript indicates that Hatfield was not included in this proceeding, which was conducted by telephone conference.

- 14 -

> Let me stop you at this point. You gentlemen are going to waste your time doing any plea negotiations in this case with me. As far as I'm concerned, given the developments in this case, I took a plea from Mr. Hatfield once when he had disagreements with his lawyers about what was going on and I don't intend to do that again. I'm going cancel the evaluation ... the main purpose of the evaluation was to see if he could enter a plea. I am not going to accept any plea.

(*Id.* at 50). In response, Hatfield's counsel stated:

> I understand the Court's unwillingness at this point to consider a plea, but if, in fact, Mr. Hatfield is willing to go ahead and cooperate with the evaluation, might it not be ... a good idea ... to go ahead and do that so we'll have it in the file in case circumstances might change?

(*Id.*). However, the Court refused to go forward with the evaluation in view of Hatfield's objection to the selection of Dr. Smith. Therefore, despite the fact that Hatfield had continued to receive psychiatric treatment while in prison, (*See, e.g.* Docket 25-3 at 42-47), and agreed to a current evaluation, his competency to stand trial or enter a plea was not evaluated on remand.

On December 19, 1996, five years after entry of the WV Supreme Court's mandate order, Judge Maynard conducted a hearing to accomplish the Supreme Court's directive set forth in *Hatfield I.* (Docket 7-4 at 60-109). At the hearing, Hatfield's former trial counsel[7] stated that they did not believe Hatfield was competent at the time he entered guilty pleas. They emphasized that shortly before the plea hearing Hatfield's psychiatrists, Dr. Haynes and Dr. Gallemore, expressed opinions that Hatfield was not competent to stand trial or enter a plea. (*Id.* at 67–70). Mr. Chafin told the Court:

---

[7] In 1988 and 1989, Petitioner was represented by Mr. Lafe Chafin and Mr. Ray Hampton. These attorneys represented Petitioner at the time of his plea and sentencing hearings. Mr. Chafin and Mr. Hampton did not represent Petitioner in either of his appeals or in his habeas actions.

> I was of the opinion at that time, my own personal opinion, that Mr. Hatfield was not competent. I had been of that opinion for some time. It was based upon a report from one psychiatrist that was acted at the state's request. It was based upon a report and a number of conversations held with Dr. Gallemore. The most recent immediately prior to the plea in this case, the most recent conversation, as I recall with Dr. Gallemore having taken place here in this courthouse on the morning or the day of the plea. This young man was hellbent on self-destruction. That was in my mind from shortly after I took to represent him. That was about the only thing he was interested in, was self-punishment ... He subsequently attempted suicide while he was confined here prior to trial. I don't believe he was interested or acclimated one way, in one instance, as to what he was doing when he manifestly, strongly indicated his desire to enter a plea of guilty.

(*Id.* at 69). Following counsel's testimony, Judge Maynard addressed Hatfield directly:

> **Court**: The [Supreme Court] directs me to ask the defendant first, to acknowledge on the record that he understands his counsel's statements. So I will ask you now, Mr. Hatfield, sir, do you think you are competent today?
> . . .
> **Hatfield**: Yes, sir, I feel competent today, your Honor.
>
> **Court**: Okay. Mr. Hatfield, then, in view of that, I would like to ask you, sir, if you can acknowledge on the record that you understand what [trial counsel] Mr. Chafin just now said. He was your counsel at the time.
> . . .
> **Hatfield**: Yes, I understand what Mr. Chafin said, your Honor.
>
> **Court**: Then, based on that, based on what your lawyer has said, and your acknowledgement that you understand it, do you still desire to plead guilty?
>
> **Hatfield**: No.
>
> **Court**: Do you want to withdraw this plea and stand a jury trial?
>
> **Hatfield**: Yes, I do, your Honor.

(*Id.* at 73-74). The Court then asked for the State's position. The Prosecuting Attorney argued that the original guilty pleas should stand, indicating that he saw

- 16 -

"nothing in [Hatfield's] demeanor or actions that indicate that he is more competent today than he was the date that he stood before the Court and stated clearly his intention to enter a plea of guilty." The Court agreed, stating in relevant part:

> Well, this is very difficult. It's difficult because the procedure that has been followed in this case subsequent to the plea, is not one that is extremely logical to me. In fact, what it appears to do tactically, is to give the defendant two bites at the apple.
>
> Simply put, he pled guilty, took his chances, the consequences were more severe than he anticipated. So now he wants to withdraw the plea and start all over ... Anytime [Hatfield] enters a plea, let's assume that you withdraw this plea and allow him to enter some subsequent plea, the ink wouldn't be dry on the plea forms before he would be back before the Supreme Court asserting, once again, that he wasn't competent to enter this plea. So he would have a third bite of the apple. At some point in our jurisprudence there needs to be an end to things ... I do not think that the [Supreme] Court's direction to the trial court here is to give the defendant the opportunity to have his cake and eat it too, as we say in the southern Appalachian mountains.
>
> I find nothing here today that should cause a different result than we had at the time this man entered his plea, and accordingly, I am going to, once again, determine that the plea was freely and voluntarily made at a time when the defendant was fully competent to enter it, and will ratify the sentence imposed at the time sentence was imposed. That will conclude this matter.

(Docket No. 7–4 at 73–84). Nearly a year later, the trial court entered an order making similar findings, denying Hatfield the right to enter pleas of not guilty and reimposing his original sentence. (Docket No. 7–1 at 62–64).

On June 15, 1998, Hatfield appealed the trial court's order to the WV Supreme Court. In the main, Hatfield argued that Judge Maynard (1) failed to follow the express directives of *Hatfield I*, which vacated the convictions and provided Hatfield with an opportunity to plead again; and (2) denied Hatfield due

process of law by refusing to accept his plea of not guilty.[8] *Hatfield II*, 522 S.E.2d 416, 417 (W. Va. 1999). The petition for appeal was accepted on October 8, 1998. (*Id.*).

By a 3-2 majority, the WV Supreme Court affirmed the trial court's order in a *per curiam* opinion.[9] Although the Court conceded that "the remand was clearly for a determination on whether the Appellant was competent on the date he originally entered his guilty pleas," the Court never addressed the failure of the trial court to hold a statutorily-mandated evidentiary hearing on competency, either prior to the guilty pleas or on remand. Choosing to ignore the essential due process argument, the majority reconstructed the appeal, identifying "the sole issue before the Court" to be "whether this Court in *Hatfield I* vacated the Appellant's earlier guilty pleas or simply ordered the lower court to reconsider the Appellant's guilty pleas in light of more fully developed evidence." *Id.* at 419. The majority then presented multiple arguments to support its finding that Hatfield's appeal was "outlandish." When confronted with the mandate order setting aside, reversing, and annulling the convictions, the Court explained in a footnote that the mandate order was "simply incorrect and the discrepancy went unnoticed until it was brought to the Court's attention by Appellee." *Id.* After citing *Hatfield I*'s finding that there was a factual basis to support Hatfield's guilty plea, the Court stated, "[o]bviously, had the Court vacated the guilty pleas, there would have been

_____

[8] Hatfield reminded the WV Supreme Court that in his first appeal he "raised numerous issues ... only two of which, the sufficiency of the plea colloquy and the sufficiency of the factual basis provided, were decided as the former issue was seemingly dispositive." The sufficiency of the original competency hearing was one of the unaddressed issues.

[9] By this time, Elliot E. Maynard had been elected to the WV Supreme Court and recused himself from the case.

- 18 -

no need to uphold the factual basis for accepting the guilty pleas." *Id.* at 421. The Court emphasized that remand was "for further development of the record" and was not intended to "give Appellant an opportunity to withdraw his original guilty pleas." The WV Supreme Court concluded that the trial court attempted to develop the record by requesting Dr. Smith to perform a retrospective evaluation of Hatfield's competence, but Hatfield refused to undergo further psychological evaluation. Thus, the trial court proceeded to hold a hearing and followed the WV Supreme Court's directive at the hearing by developing the record through the statements of counsel. Accordingly, Hatfield's due process rights were not violated.[10] *Id.* at 420.

Chief Justice Starcher, joined by Justice McGraw, wrote a vigorous dissent in which he underscored the fundamental defect in the majority's opinion; that being that "[n]o competency hearing has ever been held regarding [Hatfield]." Justice Starcher observed:

> It is axiomatic that the conviction of a legally incompetent defendant *or the failure of the trial court to provide an adequate competency determination violates due process by depriving the defendant of his constitutional right to a fair trial.*

*Hatfield II*, 522 S.E.2d at 422 (W. Va. 1999) (Starcher, C.J., dissenting) (emphasis added). The dissent further disagreed with the majority's position that the purpose of remand in *Hatfield I* was to allow a retrospective competency hearing, pointing

---

[10] The majority does not comment on the reason for Hatfield's objection to Dr. Smith or the apparent inequity in having Dr. Smith conduct a retrospective competency evaluation when he, acting as the prosecution's expert, had previously found Hatfield competent to stand trial. Further, as noted by the dissent, the Court simply side-stepped the unsettling truth; that being, that Hatfield had not yet received an adequate competency hearing despite ongoing concerns regarding his mental health.

out that if the Supreme Court had wanted a retrospective competency hearing, it would have specifically directed that one be completed, as it had in other opinions, including *State v. Cheshire,* 292 S.E.2d 628 (1982), a case heavily relied upon by the State. The dissent added that even if that were the intent of the remand, the trial court failed to follow the directive because "[i]n spite of additional evidence presented upon remand that the appellant was not competent on February 27, 1989—as testified to by his trial counsel at the December 19, 1996 hearing—the circuit court found that he was competent." *Id.* Emphasizing that the statements of counsel were the only evidence offered on remand, the dissent observed that the trial court inexplicably determined that Hatfield was competent "based only upon *prima facie* evidence [that] the appellant was not competent." *Id.* at 422. The dissent concluded that the unambiguous intent of the WV Supreme Court's order in *Hatfield I* was to vacate Hatfield's convictions, stating "the language in *Hatfield I* makes it clear that the court determined the plea colloquy to be incomplete, and as a consequence the conviction was constitutionally infirm." *Id.* at 422. To bolster his position, Justice Starcher took the unusual step of incorporating into the dissent an affidavit prepared by former Justice Richard Neely.[11] *Id.* at n 1.

---

[11] Justice Neely participated in the hearing of *Hatfield I*. His affidavit included the following relevant averments: The holding of the court was that on the facts presented the plea colloquy was insufficient ... Under the decision, if Mr. Hatfield had opted to persist in his plea of guilty, the court could have accepted the plea after a full and fair colloquy. However, it was my intention that if Mr. Hatfield declined to plead guilty the counts would be tried ...The court's opinion in Hatfield II states in a footnote that the judgment order in the case which "set aside, reversed and annulled" Mr. Hatfield's conviction was a mistake. I would respectfully disagree and note that the judgment order is consistent with the opinion and that, had a majority of the court opted to affirm the convictions, I would have dissented.

### Hatfield's State Habeas Petition

Upon denial of his direct appeal, Hatfield filed a petition for a writ of habeas corpus in the Circuit Court of Wayne County, West Virginia.[12]  (Docket No. 7–2 at 2-47). Hatfield argued generally that his incarceration violated his "constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article III, Sections 1, 5, 10, and 14 of the West Virginia Constitution." (*Id.* at 8). Recognizing that the current Wayne County Circuit Court Judge was the former Prosecuting Attorney in Hatfield's criminal action, the WV Supreme Court appointed a Special Judge, Jay M. Hoke, to preside over the habeas proceedings. On April 2, 2004, Judge Hoke ordered that all of the relevant medical and psychological documents in Hatfield's file be submitted to an independent psychiatrist, Dr. Delano H. Webb, for a retrospective opinion regarding Hatfield's

---

[12] Petitioner asserted the following errors:

1. Petitioner was not mentally competent at the time his original guilty plea was entered;

2. Petitioner was denied a full evidentiary hearing on the issue of his mental competency, where witnesses would have testified under oath, Petitioner could have presented evidence to support his defense and Petitioner could have cross-examined and otherwise confronted the witnesses on this critical issue;

3. Petitioner was denied a full evidentiary hearing on the issue of his criminal responsibility, where witnesses would have testified under oath, Petitioner could have presented evidence to support his defense and petitioner could have cross-examined and otherwise confronted the witnesses on this critical issue;

4. Petitioner was denied effective assistance of counsel;

5. Petitioner was denied due process because the circuit court's decision on remand and the West Virginia Supreme Court's decision in *Hatfield II* directly contradicted the clear holding in *Hatfield I*.

6. The trial court improperly sentenced Petitioner to life without possibility of parole "without applying any recognized standard." (*Id.* at 8, 34, 38, 41 ).

mental competency at the time the crimes were committed and at the time of his guilty pleas. (Docket No. 1-7 at 9). On June 29, 2004, Dr. Webb issued a report finding that Hatfield "was not mentally competent at the time the crime was committed. Further, he was not mentally competent at the time he entered his guilty plea." *Id.* On January 31, 2005, Judge Hoke granted Hatfield's petition for writ of habeas corpus and set aside his conviction. (Docket 7-2 at 50–51). Judge Hoke ordered that before the State could proceed against Hatfield on the original indictment, he would be entitled to an examination to determine his mental competency and a competency hearing pursuant to W. Va. Code § 27-6A-1 *et seq.*

On March 16, 2007, in an effort to address a motion filed by Respondent pursuant to West Virginia Rule of Civil Procedure 52,[13] Judge Hoke entered a supplemental order granting Hatfield habeas relief. (Docket 7-2 at 52–67). In this order, Judge Hoke specifically found, *inter alia*, that (1) on January 27, 1989, a hearing on Hatfield's competency to stand trial was held. "However, at this hearing, not a single witness testified under oath, not a single witness was subjected to cross-examination, and, in fact, no sworn testimony of any kind was considered by the trial court;" (2) the trial court declared Hatfield competent based upon a one paragraph letter from the State's expert "and without making any reference to the contrary opinions expressed by both psychiatrists, Herbert Haynes, M.D. and Johnnie Gallemore, M.D.;" (3) Hatfield attempted suicide after the competency hearing; (4) Hatfield decided to enter guilty pleas to all charges

---

[13] West Virginia Rule of Civil Procedure 52 provides, in relevant part, "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon ..."

contained in the indictment against the advice of counsel; (5) Dr. Gallemore and

Dr. Haynes believed Hatfield was not competent to stand trial at the time of the

plea hearing; (6) Hatfield's attorneys likewise did not believe Hatfield was

competent to stand trial at the time of the plea hearing; (7) two psychiatrists and a

psychologist opined that Hatfield was not mentally competent at the time the

crimes were committed; and (8) Dr. Webb made a retrospective finding that

Hatfield was not mentally competent at the time of the crimes or at the time of the

plea hearing. (*Id.*). Judge Hoke added that:

> neither the decision by the West Virginia Supreme Court in *Hatfield
> I* nor *Hatfield II* addressed the specific due process issue raised in
> Hatfield's habeas corpus petition. Thus, this habeas corpus
> proceeding is the first opportunity a court has had to address
> whether or not Petitioner's due process rights were violated when the
> trial court determined his mental competency without holding a full
> evidentiary hearing on the issue.

Judge Hoke concluded "[u]nless and until Hatfield has been afforded the full

evidentiary hearing required constitutionally, his conviction is invalid and must be

set aside." (*Id.* at 64).

### *Hatfield III* – Respondent's Appeal to the West Virginia Supreme Court of Appeals

Respondent appealed Judge Hoke's decision to the WV Supreme Court on

July 27, 2007, arguing, in relevant part, that even if the failure of the trial court to

conduct an evidentiary hearing on Hatfield's competency was improper, the error

was rectified and rendered harmless on remand when the trial court conducted

further inquiry at the hearing held on December 19, 1996. (*Id.* at 69-88). On

November 12, 2008, the WV Supreme Court issued an opinion reversing Judge

Hoke's order granting habeas relief to Hatfield and remanding the case to the

Circuit Court for proceedings consistent with the opinion. *Hatfield III*, 671 S.E.2d 453 (W. Va. 2008) (*per curiam*).[14] Although this was the first time the WV Supreme Court directly acknowledged Hatfield's allegation that he was "denied a full evidentiary hearing on the issue of competency," the Court contended that the habeas action was "*not* the first opportunity a court had to address whether the defendant's due process rights were violated when the trial court determined his mental competency without holding a full evidentiary hearing on the issue." *Id.* at 463. Finding that it had previously considered the due process issues, the WV Supreme Court determined that Hatfield was barred by the "law of the case" doctrine from raising them again in his petition for writ of habeas corpus. *Hatfield III*, 671 S.E.2d at 463. The Court explained:

> Implicit and explicit in *Hatfield I* and *Hatfield II* was this Court's concern with whether due process protections were implemented in accepting the defendant's guilty plea. Such a determination necessarily included an analysis of the defendant's competency at the time he entered the guilty plea. Thus, the circuit court in the habeas corpus proceeding was bound by the decisions previously reached by the circuit court in the criminal proceeding, which were affirmed by this Court. The circuit court in the habeas proceeding was without authority to address the issue of the defendant's competency at the time he entered his guilty plea.

*Id.* The Court again stressed that Hatfield had refused to participate in a psychological evaluation after the remand in *Hatfield I*; therefore, Hatfield created the error about which he now complained. The Court summarized, "because the error, if any, was created by the defendant in his refusal to participate in further psychological testing, he has waived any claims he had regarding such error." *Id.* at

---

[14] Chief Justice Maynard recused himself from the case. (*Id.* at 69).

464. On remand, the Circuit Court of Wayne County reinstated Hatfield's original convictions and sentence on December 12, 2008. (Docket No. 7–2 at 106–07).

**Hatfield's Present Federal Habeas Petition**

On February 10, 2009, Hatfield filed the present petition for habeas relief pursuant to 28 U.S.C. § 2254. (Docket No. 1). A response was filed on April 1, 2009 generally denying any violation of Hatfield's constitutional rights, but conceding that his petition was timely filed and he had colorably exhausted his State remedies. (Docket No. 6 at 1-2).[15] Respondent also filed a Motion for Summary Judgment and accompanying memorandum. (Docket Nos. 7 and 8).

This action was stayed on May 29, 2009, to allow Hatfield the opportunity to present new evidence to the Supreme Court of Appeals of West Virginia, which had not been considered in *Hatfield III*. (Docket No. 13 at 1–2). Hatfield subsequently filed a motion to reopen the action, which the Court granted. (Docket Nos. 15 and 18). Respondent re-filed his Motion for Summary Judgment and accompanying memorandum and Hatfield filed a Cross-Motion for Summary Judgment. (Docket Nos. 19, 20 and 29). Thus, the matter is ripe for resolution.

## II.   **Standards of Review**

### A.   **Motion for Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is

---

[15] Respondent reserved the right to file a further answer on the issue of exhaustion if this Court denied Respondent's Motion for Summary Judgment. (Docket No. 6 at 2).

entitled to judgment as a matter of law. Motions for summary judgment impose a heavy burden on the moving party; for, it must be obvious that no material facts are in dispute and no rational trier of fact could find for the nonmoving party. *Miller v. Federal Deposit Ins. Corp.,* 906 F.2d 972, 974 (4th Cir. 1990).

Nonetheless, the "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). While any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987). Here, both parties have filed motions for summary judgment and concede that the material facts are not in dispute. From independent review, the undersigned finds that the record is adequate and agrees that no genuine issues of material fact exist between the parties. As the issues in controversy are clearly matters of law, resolution by summary judgment is appropriate.

**B.    Petitions Seeking Habeas Relief Under § 2254**

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214, authorizes a federal district court to entertain a petition for habeas corpus relief from a prisoner in State custody, "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). As a preliminary matter and before undertaking a habeas review, the federal court

must confirm that the petitioner has fully adjudicated his claims on the merits, thereby exhausting the remedies available to him in the state courts. "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that ... the applicant has exhausted the remedies available in the courts of the State," 28 U.S.C. § 2254(b)(1)(A). Although Respondent has not argued that Hatfield failed to comply with the exhaustion requirements of § 2254, Respondent has reserved the right to raise the argument if his motion for summary judgment is denied. Consequently, a discussion of the exhaustion requirement is indicated.

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *see also Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). To provide the State with this opportunity, "the prisoner must 'fairly present' his claim in each appropriate state court...thereby alerting that court to the federal nature of the claim." *Baldwin*, 541 U.S. at 29; *see also Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997). The habeas petitioner must raise his claim before every available state court, including those courts whose review is discretionary. *O'Sullivan v. Boerckel*, 526 U.S. 838, 847, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).

The burden of demonstrating fair presentment lies with the habeas petitioner, who must "do more than scatter some makeshift needles in the haystack of the state court record." *Mallory v. Smith*, 27 F.3d 991, 995 (4th Cir. 1994). However, "[i]t is not necessary to cite book and verse on the federal constitution so long as the constitutional substance of the claim is evident," *West*

*v. Wright,* 931 F.2d 262, 266 (4th Cir. 1991), such that "both the operative facts and the controlling legal principles [are] presented to the state court." *Baker v. Corcoran,* 220 F.3d 276, 289 (4th Cir. 2000).

The Fourth Circuit Court of Appeals has determined that "the phrase 'adjudication on the merits' in section 2254(d) excludes only claims that were not raised in state court, and not claims that were decided in state court, albeit in a summary fashion." *Thomas v. Taylor,* 170 F.3d 466, 475 (4th Cir. 1999). When a state court summarily rejects a claim and does not set forth its reasoning, the federal court reviews the record and clearly established Supreme Court law *de novo, Bell v. Jarvis,* 236 F.3d 149 (4th Cir. 2000), confining "[its] review to whether the state court's determination 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.' " *Bell,* 236 F.3d at 158 (quoting *Bacon v. Lee,* 225 F.3d 470, 478 (4th Cir. 2000)). In his state habeas petition, Hatfield raised each of the three claims that he raises in his federal petition.[16] (Docket No. 7–2 at 81–88). On these claims, he presented arguments expressly based on federal law, specifically referencing the Fifth, Sixth, Eighth and Fourteenth Amendments and *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); and *Pate v. Robertson,* 383 U.S. 3754, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), as well as state grounds. *Id.* As such, the undersigned finds

---

[16] Hatfield's state habeas petition included three additional claims to those at issue in the present federal habeas petition.

- 28 -

that these claims were clearly exhausted.[17] Moreover, in his first direct appeal to the WV Supreme Court, Hatfield raised each of the three claims included in his federal habeas corpus petition.[18] (Docket No. 12-1 at 55–59). Specifically, Hatfield referenced the Fifth, Sixth, Eighth and Fourteenth Amendments; *Drope v. Missouri*, 420 U.S. 162 (1975); and *Pate v. Robertson*, 383 U.S. 3754 (1966). Therefore, the undersigned finds that these claims were exhausted on direct appeal as well.[19]

Having concluded that Hatfield exhausted his state court remedies, the undersigned looked to the substantive merits of the petition. Subsection (d) of § 2254 provides that an application for writ of habeas corpus by a person in State

---

[17] In *Hatfield III*, the Court summarily notes that "[t]he other issues set forth in the habeas matter were deemed moot by the lower court when it awarded summary judgment on the competency issue. Thus, the other habeas issues are not before this Court for review." 671 S.E.2d 453, 458 n. 7 (W.Va. 2008). This statement directly contradicts the Circuit Court's Order and Supplemental Order on record. The WV Supreme Court had multiple chances to address Hatfield's due process complaints regarding the lack of a competency hearing. Rather than addressing the issue, which the Circuit Court identified as "crucial" in its holding, the WV Supreme Court declared it "moot." Simply stating that an issue is moot does not make it so.

[18] Hatfield's second appeal dealt with the Circuit Court's interpretation of the WV Supreme Court's decision and order in *Hatfield I* and, therefore, did not address any of the substantive constitutional issues before this Court in the present case.

[19] Assuming *arguendo* that Hatfield had not exhausted his claims at the state court level, the Fourth Circuit has recognized that "[s]tate remedies may be rendered ineffective by inordinate delay or inaction in state proceedings." *Ward v. Freeman*, 1995 WL 48002, *1 (4th Cir. 1995). The circumstances presented in Hatfield's case rise to the level of the delay in *Ward* and render Hatfield's state court remedies ineffective. Hatfield's post-conviction appeals and habeas action took the West Virginia state courts nearly 20 years to resolve, including a delay of six years between the WV Supreme Court's decision in *Hatfield I* and the trial court's order reimposing Hatfield's original sentence and another eight-year delay between the filing of Hatfield's state habeas action and the WV Supreme Court's decision in *Hatfield III*. Courts in multiple circuits, including the Fourth Circuit, have found delays of five years or more to excuse a habeas petitioner from the exhaustion requirement of § 2254. *See, e.g., Lee v. Stickman*, 357 F.3d 338 (3d Cir. 2004); *Ward v. Freeman*, 1995 WL 48002 (4th Cir. 1995); *Mathis v. Hood*, 851 F.2d 612 (2d Cir. 1988); *Burkett v. Cunningham*, 826 F.2d 1208 (3d Cir. 1987).

custody "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim" is:

(1) contrary to, or involves an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)(1) and (2); *see also Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A review under § 2254(d)(2) necessarily centers on the factual determinations made by the state court. To establish that habeas relief is warranted under this section, a petitioner must rebut by clear and convincing evidence the presumption that a state court's factual findings are correct. 28 U.S.C. § 2254(e)(1). Here, Respondent urges the Court to dispose of the habeas petition pursuant to §§ 2254(d)(2) and (e)(1), arguing that the heart of this matter is the determination made by the state court that Hatfield was competent at the time he entered guilty pleas. According to Respondent, competency determinations have been held to be factual determinations by the Supreme Court of the United States ("Supreme Court"); accordingly, this Court must defer to the state court's finding of competency in the absence of clear and convincing evidence to the contrary. While the logic of Respondent's argument cannot be disputed, the undersigned disagrees with the premise. Certainly, while the trial judge's declaration that Hatfield was competent to enter guilty pleas is the pivotal determination that led to Hatfield's convictions and sentence, that finding is not the core issue before this Court. Instead, the essential issue is whether Hatfield's constitutional right to procedural due process was protected by means of an adequate competency

hearing *before* the factual determination was made by the trial judge. As such, the central issue here is not one of fact, but is one of law. [20]

Having determined that §§ 2254(d)(2) and (e)(1) are not dispositive, the undersigned looks to the remaining prong of § 2254(d). The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meanings. *Williams,* 529 U.S. at 405. A federal court may grant a habeas writ under the "unreasonable application" clause, "if the State court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lewis v. Wheeler*, 609 F.3d 291 at 300–01 (citing *Williams,* 529 U.S. at 413). A federal court may not issue a writ under this standard "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather the application must also be unreasonable." *Williams*, 529 U.S. at 411.

As stated *supra,* the central issue in this case is the adequacy of the competency hearing afforded to Hatfield. The Supreme Court set forth the

---

[20] If § 2254(d)(2) was applicable, the undersigned finds that Hatfield presented clear and convincing evidence to rebut the presumption of correctness. Both of Hatfield's treating physicians found him to be incompetent after extensive evaluation and treatment. To the contrary, a psychologist found Hatfield competent based largely upon standardized tests, and Dr. Smith provided no basis at all for his one sentence opinion that Hatfield could stand trial. On the day of the plea hearing, after a second suicide attempt by Hatfield, his treating psychiatrists again opined that he was not competent to enter a plea. Consequently, the only opinions submitted on or near the day of the plea hearing supported a finding that Hatfield was not competent to enter guilty pleas. These opinions were never rebutted. Similarly, as Justice Starcher pointed out in his dissent in *Hatfield II*, the only "evidence" before the trial court on remand were the statements of Hatfield's attorneys that they felt he was incompetent at the time of the plea hearing. No additional evidence was submitted to establish that Hatfield was competent at the time he entered guilty pleas.

governing legal principles for procedural due process in the context of pre-trial competency hearings in *Pate v. Robertson*, 383 U.S. 3754 (1966); *Drope v. Missouri*, 420 U.S. 162 (1975); and *Medina v. California*, 505 U.S. 437, 451 (1992). Despite Hatfield's repeated references to *Pate* and *Drope* in his post-conviction appeals and state habeas action, the WV Supreme Court never examined the adequacy of the trial court's competency hearing.  Therefore,, the WV Supreme Court never applied the governing legal principle relevant to the present case. As the WV Supreme Court failed to apply *Pate*, *Drope*, or *Medina* in any of its three decisions, the "unreasonable application" clause is inapposite.

For the final step in the analysis, the decisions of the WV Supreme Court were examined under the "contrary to" clause of § 2254(d)(1). Ultimately, this clause serves as the basis for the undersigned's recommendation that Hatfield's habeas petition be granted. A federal court may grant habeas relief under the "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than the [United States Supreme] Court has on a set of materially indistinguishable facts." *Lewis v. Wheeler*, 609 F.3d 291, 300 (4th Cir. 2010) (citing *Williams*, 529 U.S. at 413). Supreme Court precedent requires states to develop "adequate" protective procedures to ensure that only competent defendants are put on trial, *Pate*, 383 U.S. at 378, and to provide a criminal defendant whose competency is at issue with "a reasonable opportunity to demonstrate that he is not competent to stand trial." *Medina*, 505 U.S. at 451. As discussed in detail *infra*, inasmuch as Hatfield was never afforded a reasonable opportunity to demonstrate that he was not competent to stand trial, the results of

the WV Supreme Court's decisions in *Hatfield I, II* and *III* are contrary to the clearly established federal law set forth in *Pate, Drope,* and *Medina.*

### III.   **Analysis**

As stated, Hatfield raised three grounds of error in his petition, arguing that he: (1) was not competent at the time of his guilty plea; (2) was denied a full evidentiary hearing regarding his competency; and (3) was denied a full evidentiary hearing regarding his criminal responsibility. (Docket No. 1 at 9–100). As this case can be resolved on the second ground, the undersigned need not address the merits of Hatfield's first and third grounds of error.

### A.   **Clearly Established Federal Law**

Clearly established federal law "refers to the holdings, as opposed to the dicta" of the Supreme Court in effect at the time of the disputed state court decision. *Williams v. Taylor,* 529 U.S. at 412 (2000). It has long been a principle in American jurisprudence that "the criminal trial of an incompetent defendant violates due process." *Cooper v. Oklahoma,* 517 U.S. 348, 354, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) (quoting *Medina v. California,* 505 U.S. at 453 (1992); *Drope v. Missouri,* 420 U.S. at 171–72 (1975); *Pate v. Robinson,* 383 U.S. at 378 (1966)). The right of criminal defendants to be tried only if competent "is fundamental to an adversary system of justice." *Drope,* 420 U.S. at 172. *See also Riggins v. Nevada,* 504 U.S. 127, 139-140, 112 C.Ct. 1810, 118 L.Ed.2d 479 (1996) (Kennedy, J., concurring) ("Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without

- 33 -

penalty for doing so. *Drope,* 420 U.S. at 171-172 (1975).”). The test for competency to stand trial is well-established:

> [I]t is not enough for the district judge to find that the defendant is oriented to time and place and has some recollection of events, but that the test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.

*Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (internal quotation marks and bracketing omitted). Simply stated, a defendant whose mental condition is such that he lacks the ability to assist in preparing his own defense may not be subjected to trial. *Drope,* 420 U.S. at 903.

It is also well-established that as a matter of procedural due process, states must develop “adequate” protective procedures to ensure that only competent defendants are put on trial. *Pate,* 383 U.S. at 378. “Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property.” *Carey v. Piphus,* 435 U.S. 247, 259, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). As a general proposition, “[t]he fundamental requirement of due process is the opportunity to be heard ‘at a meaningful time and in a meaningful manner.’” *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). *See also Joint Anti-Fascist Comm. v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (stating that the “right to be heard before being condemned to suffer grievous loss of any kind . . . is a principle basic to our society.”) (Frankfurter, J., concurring).

Although the Supreme Court has not issued specific standards for assessing the adequacy of competency hearings, the Court has established as a threshold that

- 34 -

when bona fide doubt exists as to the mental competency of a criminal defendant to stand trial, the state must make further inquiry and the defendant must be given the opportunity to demonstrate that he is not competent. *Medina,* 505 U.S. at 451. The Supreme Court's decisions in *Pate* and *Drope* provide additional guidance on the scope of due process rights in the context of a defendant's mental competency to stand trial. In *Pate,* the Court ruled that the state court had deprived the defendant of his constitutional right to a fair trial when it failed to implement a state statute requiring that a jury be impaneled to determine the defendant's competency. *Pate,* 383 U.S. at 385. Although the defendant in *Pate* had produced four witnesses who testified that he was "insane" and his counsel insisted throughout the trial that his sanity was in issue, the state court found that this evidence was insufficient to trigger a competency hearing. In particular, the state court emphasized that the defendant's mental alertness and understanding displayed in colloquies with the trial judge demonstrated his competency to stand trial. The Supreme Court rejected this reasoning, finding that it offered no justification for ignoring uncontradicted testimony regarding the defendant's irrational behavior, stating "[w]hile [defendant's] demeanor at trial might be relevant to the ultimate decision as to his sanity, it cannot be relied upon to dispense with a hearing on that very issue." *Pate,* 383 U.S. at 386 (citing *Bishop v. United States,* 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956)).

In *Drope,* the Supreme Court similarly found that Missouri's statutory scheme was "constitutionally adequate" to protect the defendant's right not to be tried while incompetent. *Drope,* 420 U.S. at 173. However, the Court found that the defendant was deprived of his due process rights when the state court failed to

- 35 -

follow that scheme[21] and order a psychiatric examination after the defendant attempted suicide during the trial. *Id.* at 180. The Court noted that although defendant presented evidence of episodic irrational behavior, the state court failed to appreciate that the aberrant episodes were indicia of incompetence and, therefore, neglected to investigate the defendant's competency to continue to stand trial. The Supreme Court concluded that "the record reveals a failure to give proper weight to the information suggesting incompetence which came to light during trial," *Id.*, stressing that even "when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Id.* at 181. Ultimately, whenever a criminal defendant's competence is at issue, before or during trial, a state is constitutionally obligated to provide the defendant with "a reasonable opportunity to demonstrate that he is not competent to stand trial." *Medina*, 505 U.S. at 451 (1992).

### B.     Contrary to Clearly Established Federal Law

At the time of the WV Supreme Court's decisions in *Hatfield I*, *Hatfield II* and *Hatfield III*, the United States Supreme Court had decided *Pate*, *Drope*, and *Medina*. Both parties concede, and the record reflects, that Hatfield's competency was in doubt from the outset of his criminal indictment. Consequently, he was

---

[21] The Missouri state statute approved by the Court in *Drope* as constitutionally sufficient included the following provision:

> The court shall determine the issue of mental fitness to proceed and may impanel a jury of six persons to assist in making the determination. The report or reports may be received in evidence at any hearing on the issue *but the party contesting any opinion therein shall have the right to summon and to cross-examine the examiner who rendered such opinion and to offer evidence upon the issue.*

Missouri Rev.Stat. § 552.020(7) (1969) (emphasis added).

entitled to a reasonable opportunity to demonstrate his lack of competence to stand trial or enter a guilty plea. To provide this opportunity, the trial court was obligated to conduct an "adequate" hearing on the issue of Hatfield's competency. Moreover, Supreme Court precedent required the trial court to recognize that an initial finding of competency to stand trial might not be sufficient to carry Hatfield through the trial phase. If circumstances reasonably suggested a significant deterioration in Hatfield's mental competency, then another "adequate" hearing would be necessary to protect Hatfield's due process rights. *See Drope*, 420 U.S. at 181.

Applying this legal framework, it is clear that the decisions of the WV Supreme Court in *Hatfield I, Hatfield II* and *Hatfield III,* which in effect affirmed the competency proceedings conducted by the trial court, were contrary to the clearly established due process rights set forth in *Pate, Drope,* and *Medina.* Without any doubt, Hatfield was initially denied a "reasonable opportunity to demonstrate" that he was not competent to stand trial at the time the trial court made its first determination that Hatfield was competent. The competency "hearing" provided by the trial court lacked all of the essential elements that are hallmarks of procedural due process; such as, the right to offer witnesses, cross-examine adverse witnesses, submit supportive evidence, and rebut or impeach opposing evidence. In addition, Hatfield was again denied a reasonable opportunity to demonstrate his lack of competency at the time he entered guilty pleas. Despite the uncontradicted report of counsel that Hatfield's psychiatrists felt he was not competent to enter guilty pleas, no substantive inquiry was made by the trial court into Hatfield's competency. Finally, on reconsideration after the remand ordered by the WV Supreme Court in *Hatfield I,* the presiding judge reconfirmed Hatfield's

- 37 -

guilty pleas as having been given voluntarily and intelligently, without making any legitimate effort to resolve the incompatible opinions presented to him. Therefore, the decisions of the WV Supreme Court condoning the trial court's actions in determining Hatfield's competency were contradictory to any plausible interpretation of the Supreme Court's precedent.

Like the jurisdictions in *Pate* and *Drope,* West Virginia's statutory scheme jealously guards a defendant's right to a fair trial. *See* W.Va. Code § 27-6A-1 *et seq.*[22] Hatfield's defense counsel appropriately triggered the statutory protections by requesting a competency hearing. Prior to the competency hearing, the trial court issued three orders to allow for Hatfield's mental health treatment and evaluation, explicitly recognizing the need to make an inquiry into Hatfield's competency to stand trial. Consistent with the West Virginia statute, four different mental health professionals examined Hatfield to assess his competency, including one expert selected by Hatfield. Conflicting reports were generated by the mental health professionals. At this point in the process, however, the trial court inexplicably

---

[22] As previously indicated, W.Va. Code § 27-6A-1 (1983) provides in relevant part: (a) Whenever a court of record... believes that a defendant in a felony case ... may be incompetent to stand trial or is not criminally responsible by reason of mental illness ... it may at any stage of the proceedings after return of an indictment or issuance of a warrant or summons against the defendant, order an examination of such defendant to be conducted by one or more psychiatrists, or a psychiatrist and a psychologist.

W.Va. Code § 27-6A-2 (1983) continues: (a) At a hearing to determine a defendant's competency to stand trial, the defendant shall be present and he shall have the right to be represented by counsel and introduce evidence and cross-examine witnesses. The defendant shall be afforded timely and adequate notice of the issues of the hearing and shall have access to a summary of the medical evidence to be presented by the state. The defendant shall have the right to an examination by an independent expert of his choice and testimony from such expert as a medical witness on his behalf. All rights generally afforded a defendant in criminal proceedings shall be afforded to a defendant in such competency proceedings.

deviated from the statutorily mandated procedure.[23] Hatfield was denied an evidentiary hearing. The record reflects that the trial court made its initial declaration that Hatfield was competent to stand trial on the basis of one sentence in a one-paragraph letter generated by the prosecution's expert. The competency hearing filled only two pages of transcript[24] and was dedicated almost entirely to a discussion between the trial judge and the Prosecuting Attorney over the State's failure to obtain a full report from its expert psychiatrist, Dr. Smith. Hatfield was given no opportunity to rebut or impeach the opinion. Neither party introduced any evidence into the record. Neither party was able to call witnesses to testify at the hearing. Neither party was afforded the opportunity to cross-examine any of the mental health professionals that had evaluated Hatfield.[25] Hatfield was not given the opportunity to testify on his own behalf. Moreover, he was denied timely notice of the medical evidence to be offered by the State; he received Dr. Smith's unsupported opinion at the time of the hearing. The arbitrary fashion in which Hatfield's competency hearing was conducted indisputably denied him the

---

[23] The failure of the trial court to comply with the state mandated procedures in West Virginia Code Chapter 27, Article 6A is not the source of the constitutional violation in the present case. Federal habeas actions are limited to a review of state action for violations of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). However, the West Virginia statute is relevant to the constitutional violation in this case inasmuch as the procedures contained therein are similar to those approved by the United States Supreme Court as constitutionally adequate in *Pate* and *Drope* and reflect the determination of the State of West Virginia as to what procedures are necessary to safeguard the rights of its citizens.

[24] *See* Docket No. 27-5 for the transcript of hearing in its entirety.

[25] The lack of cross-examination in this instance was particularly significant as Dr. Smith, the State's psychiatrist, was the only mental health professional whose opinion the Circuit Court explicitly relied upon. Dr. Smith's one-paragraph letter concluded that Petitioner was competent to stand trial. Dr. Smith offered no medical evidence to support this conclusion. Petitioner had no opportunity to question Dr. Smith regarding the underlying facts and assumptions Dr. Smith used in determining Petitioner's competency.

opportunity to be heard in a "meaningful manner," the fundamental requirement of procedural due process. *Mathews*, 429 U.S. at 333.

Equally as disturbing was the failure of the trial court to conduct even the semblance of a competency hearing on the day that Hatfield entered guilty pleas against the advice of counsel and arguably contrary to his own interests. At the plea hearing, defense counsel raised bona fide doubt as to Hatfield's mental competency to enter a guilty plea. Between the first declaration of competency made by the trial judge and the plea hearing, Hatfield had made another suicide attempt; his treating psychiatrist had recommended electric convulsant treatments and inpatient hospitalization; and on the day of the hearing, Hatfield's psychiatrist opined that Hatfield was not competent to enter a plea. With full knowledge of this information, the trial judge made his own determination that Hatfield was competent—without a hearing and based exclusively upon Hatfield's demeanor and presentation during the plea colloquy.

On appeal, the WV Supreme Court ignored the trial court's failure to follow the state's statutory process for determining competency, both initially and at the plea hearing, and only superficially addressed Hatfield's due process rights. Rather, the WV Supreme Court attacked the sufficiency of the plea colloquy, which while inadequate, was not the primary constitutional shortcoming. As a result, when the case was remanded for further proceedings, Hatfield's due process right to an adequate hearing on competency was again violated. Expressing confusion over the Supreme Court's directive, the same trial judge simply reinstated Hatfield's defective guilty pleas, despite additional evidence establishing that Hatfield was incompetent at the time he entered the pleas; in the absence of any updated

professional evaluation of Hatfield's competency; without a hearing; and contrary to Hatfield's express desire to enter pleas of not guilty.

The undersigned's conclusion that Hatfield's due process rights were violated is further supported by the Supreme Court's analysis in *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). Although *Ford* deals exclusively with post-trial competency hearings in death penalty cases, it provides an outline of the minimum level of procedural standards necessary to protect an individual's due process rights in the context of a competency hearing. As demonstrated by the decision in *Ford,* the Supreme Court has consistently held that the Eighth Amendment prevents the execution of an incompetent convict, but the standard for establishing post-conviction competency is less stringent than the standard for determining competency to stand trial. *Cf. Ford,* 477 U.S. at 422 (Powell, J., concurring) ("I would hold that the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it."), and *Id.* at 417 (Marshall, J., plurality opinion) (finding that Eighth Amendment forbids execution of "one whose mental illness prevents him from comprehending the reasons for the penalty or its implications"); *with Cooper,* 517 U.S. at 354, ("A defendant may not be put to trial unless he 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as factual understanding of the proceedings against him.' " (quoting *Dusky v. United States,* 362 U.S. 402 (1960) (omissions and alterations in original)). The Supreme Court has been equally consistent in holding due process protections in post-conviction proceedings are limited when compared to the protections that attach to a defendant prior to and during trial. *See e.g., District*

*Attorney's Office for Third Judicial Dist. V. Osborne*, 129 S.Ct. 2308, 2320, 174 L.Ed.2d 38 (2009) (holding that a "criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man."); *Osborne*, 129 S.Ct. at 2335 (Stevens, J., dissenting) (recognizing that a criminal defendant postconviction "is surely entitled to less than 'the full panoply of rights,' that would be due a criminal defendant prior to conviction."); *Ohio Adult Parole Auth. V. Woodard*, 523 U.S. 272, 288–89, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998) (O'Connor, J., concurring in part and concurring in the judgment); *Greenholtz v. Inmates of the Neb. Penal & Corr. Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Pennsylvania v. Finley*, 481 U.S. 551, 555–57, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). As Justice Powell explained in *Ford*, the due process protections required by the Eighth Amendment at a post-conviction competency hearing are limited because an inmate sentenced to execution must have already been "judged competent to stand trial, or his competency must have been sufficiently clear as not to raise a serious question for the trial court." *Ford*, 477 U.S. at 426 (Powell, J., concurring in part and concurring in the judgment).[26] Questions regarding an inmate's competency to be executed present an "important" question but one that is "not comparable to the antecedent question whether [the inmate] should be executed at all." *Id.* at 425. This language stands in stark contrast to the Supreme Court's jurisprudence on the

---

[26] The four dissenters in *Ford* agreed with Justice Powell's conclusion on this point. *See Ford*, 477 U.S at 429 (O'Connor, J., concurring in the result in part and dissenting in part) ("I consider it self-evident that once society has validly convicted an individual of a crime and therefore established its right to punish, the demands of due process are reduced accordingly."); *Id.* at 435 (Rehnquist, J., dissenting) ("The defendant has already had a full trial on the issue of guilt, and a trial on the issue of penalty; the requirement of still a third adjudication offers an invitation to those who have nothing to lose by accepting it to advance entirely spurious claims of insanity.")

constitutional import of pre-trial determinations of a defendant's competency to stand trial. *See Cooper v. Oklahoma*, 517 U.S. 348, 364, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) (holding "an erroneous determination of [trial] competence threatens a fundamental component of our criminal justice system-the basic fairness of the trial itself."); *Riggins v. Nevada*, 504 U.S. 375, 384 (1996). In light of these differences, it stands to reason that the Constitution requires procedures *at least* as protective for a pre-trial competency hearing as those required in a post-conviction competency hearing.

The Court in *Ford* held unconstitutional a Florida procedure that empowered the Governor to make a competency determination on the basis of three psychiatric opinions, without consideration of any evidence submitted by the prisoner. In his controlling concurrence, Justice Powell held that once a showing of incompetence had been made, fundamental fairness inherent in the "procedural protections afforded by the Due Process Clause" dictated that a "fair hearing" with a neutral decision-maker was required to protect the Eighth Amendment's prohibition against the execution of the insane. *Ford,* 477 U.S. at 424-26 (Powell, J., concurring in part and concurring in the judgment). Specifically, Justice Powell found that Florida's post-trial competency hearing procedure did not comply with procedural due process because there was no opportunity to offer "contrary medical evidence or even [explain] the inadequacies of the State's examinations." *Id*. At a minimum, states should provide an opportunity for counsel to present evidence, "including expert psychiatric evidence that may differ from the State's own psychiatric examination." *Id*. at 427. As the *Ford* opinion establishes, the Constitution requires that a criminal defendant at a post-conviction competency

hearing have the opportunity to present psychiatric evidence and to contest the findings of the state's experts. *Ford*, 477 U.S. at 424–27. By contrast, in the instant case, Hatfield was not provided even the "bare bones" opportunity deemed fundamental in *Ford*. Consequently, the undersigned finds that the procedural due process rights guaranteed to Hatfield by *Pate, Drope*, and *Medina* were violated by the actions of the trial court and the decisions of the WV Supreme Court.[27]

## C.   Harmless Error

Respondent argued in the state habeas proceeding that the error created by the trial court's failure to conduct an adequate competency hearing was harmless.[28] The undersigned disagrees with this contention. "The harmless-error doctrine

---

[27] The Supreme Court's decision *Panetti v. Quarterman* construing Justice Powell's controlling concurrence further buttresses the conclusion that Hatfield's due process rights were violated. In *Panetti*, the inmate made a motion claiming that due to mental illness, he was incompetent to be executed and requesting a competency hearing. 551 U.S. 930, 938, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007). The inmate's motion was supported by a letter and declaration from a psychologist and a law professor who interviewed the inmate while he was on death row and concluded that he was not competent to be executed. *Panetti*, 551 U.S. at 938. The trial court ordered the petitioner to be examined by two mental health experts, as required by the state statute. *Id.* The two mental health experts reported that petitioner was competent to be executed. *Id.* at 940. The trial court advised petitioner's counsel that the competency determinations had been submitted and that counsel had ten days to make any additional motions. Petitioner's counsel submitted objections to the two mental health experts' findings, "criticiz[ing] the methodology and conclusions of the court-appointed experts," seeking funds for an independent expert, and requesting a competency hearing. *Id.* at 940–41. The state court then closed the case with a brief order that did not address petitioner's objections. *Id.* at 941. The Supreme Court found that *Ford* clearly established that it was constitutional error for the state court to "[fail] to provide petitioner with an adequate opportunity to submit expert evidence in response to the report filed by the court-appointed experts." *Id.* at 948. In particular, the *Panetti* Court read Justice Powell's concurrence as unequivocally establishing that due process requires that prisoners who have made a substantial showing that they are not competent to be executed must be provided with a "constitutionally adequate opportunity to be heard." *Panetti*, 551 U.S. at 952. This "constitutionally adequate opportunity" included "at a minimum, that a court allow a prisoner's counsel the opportunity to make an adequate response to evidence solicited by the state court." *Id.* at 952 (2007). *Panetti's* analysis of *Ford* is relevant to the present case because it confirms by analogy the inescapable conclusion that prohibiting a defendant from responding to the state's evidence (through testimony, the introduction of evidence, or cross-examination) violates the defendant's due process rights as established in *Pate, Drope*, and *Medina*.

[28] Respondent alleged that "even had there been a failure to conduct an evidentiary hearing before accepting the guilty plea, the error was harmless because it was cured by subsequent proceedings." *Hatfield III*, 671 S.E.2d 453, 458 (W.Va. 2008).

recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (internal citation omitted). "The Supreme Court explained in *Brecht v. Abrahamson* that, in determining the harmlessness of a state court's constitutional error in a criminal trial, a federal habeas court asks whether the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Wiggins v. Boyette,* 635 F.3d 116, 121 (4th Cir. 2011) (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). *See also Fry v. Pliler,* 551 U.S. 112, 121, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (stating "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht [v. Abrahamson],* 507 U.S. 619 (1993).")). "Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." *U.S. v. Barnette,* 644 F.3d 192, 213 (4th Cir. 2011) (citing Federal Rule of Criminal Procedure 52(a)).

A reasonable opportunity to demonstrate one's lack of competence to stand trial or enter a guilty plea is a substantial right as a matter of procedural due process. *Medina,* 505 U.S. at 451 (1992). Here, the trial court's failure to provide Hatfield with that opportunity was not harmless error as is demonstrated by the trial court's actions and statements. At Hatfield's competency hearing, the trial court explicitly relied upon a one-page letter with no supporting medical evidence in making its determination of Hatfield's competency to stand trial. The inability of

Hatfield to present evidence, testify on his own behalf, or cross-examine the state's expert prevented Hatfield from meaningfully participating at his competency hearing. In the absence of any protective procedures, the arbitrary nature of Hatfield's hearing was outcome determinative as the trial court found Hatfield competent based on a nonexistent evidentiary record.  This error was repeated at least two additional times with the end result being that Hatfield was convicted and sentenced based upon his guilty pleas. Accordingly, the undersigned concludes that the trial court's failure to provide Hatfield with a reasonable opportunity to demonstrate that he was not competent violated the Due Process Clause and had a "substantial and injurious effect or influence" on the trial court's determinations that Hatfield was competent to stand trial and to enter guilty pleas. This substantive error was not rectified or rendered harmless because the WV Supreme Court never applied the relevant controlling federal precedent. Had it done so, Hatfield's convictions based upon the flawed guilty pleas would have been set aside and a competency hearing would have been completed before the state pursued the charges in the indictment.  As a result, the undersigned finds that Hatfield's due process rights were violated; that these violations were substantively injurious; and the injury was neither rectified nor rendered harmless.

### D.    Appropriate Remedy

As the undersigned finds that the errors made in determining Hatfield's competency to stand trial and plead guilty were not harmless, the question becomes whether it is possible to make an *ex post* determination of Hatfield's competency at the time of his 1989 guilty pleas. Retrospective determinations of a defendant's competency are disfavored under Supreme Court precedent because of "the inherent

difficulties of such a nunc pro tunc determination under the most favorable circumstances." *Drope*, 420 U.S. at 183. *See also Pate*, 383 U.S. at 386–87 (stating "we have previously emphasized the difficulty of retrospectively determining an accused's competence to stand trial. The jury would not be able to observe the subject of their inquiry, and expert witnesses would have to testify solely from information contained in the printed record. That [defendant's] hearing would be held six years after the fact aggravates these difficulties.") (internal citation omitted); *Dusky*, 362 U.S. at 403 (remanding the case to the District Court for a new competency hearing in light of the "difficulties of retrospectively determining the petitioner's competency as of more than a year ago[.]").

However, retroactive competency determinations are "permissible when a court can conduct a meaningful hearing to evaluate retrospectively the competency of the defendant." *McGregor v. Gibson*, 248 F.3d 946, 962 (10th Cir. 2001) (en banc) (citation omitted). *See also Reynolds v. Norris*, 86 F.3d 796, 802 (8th Cir. 1996) (holding same); *U.S. ex rel. Bilyew v. Franzen*, 842 F.2d 189, 192 (7th Cir. 1988) (holding same).[29] To determine whether a "meaningful hearing" can be conducted, courts look at four factors:

> (1) [T]he passage of time, (2) the availability of contemporaneous medical evidence, including medical records and prior competency determinations, (3) any statements by the defendant in the trial record, and (4) the availability of individuals and trial witnesses, both experts and non-experts, who were in a position to interact with defendant before and during trial, including the trial judge, counsel for both the government and defendant, and jail officials.

*McGregor*, 248 F.3d at 962–63. *See also Reynolds*, 86 F.3d at 803 (stating "When

---

[29] The Fourth Circuit has not extensively addressed the subject of retrospective competency hearings.

determining whether a meaningful hearing may be held, we look to the existence of contemporaneous medical evidence, the recollections of non-experts who had the opportunity to interact with the defendant during the relevant period, statements by the defendant in the trial transcript, and the existence of medical records.") (citing *Wheat v. Thigpen*, 793 F.2d 621, 630–31 (5th Cir. 1986)); *Bilyew*, 842 F.2d at 193 (finding that a meaningful hearing "can be [conducted] if the state of the record, together with such additional evidence as may be relevant and available, permits an accurate assessment of the defendant's condition at the time of the original state proceedings.")

In the present case, 23 years have elapsed since Hatfield's competency hearing. By comparison, in *Dusky*, the Supreme Court expressed concern over a retrospective competency hearing more than one year after the initial hearing. *Dusky*, 362 U.S. at 403. In *Pate*, the Supreme Court expressed concerns over a retrospective competency hearing six years after the initial hearing. *Pate*, 383 U.S. at 386–87. In *Drope*, the Supreme Court found that a retrospective competency hearing six years after the initial competency hearing would not be adequate. *Drope*, 420 U.S. at 183. Undoubtedly, the 23-year lapse of time in this case weighs heavily against a finding that a retrospective competency hearing would be "meaningful" in any sense of the word.[30]

The record in the present case contains: assorted medical records; an evaluation

---

[30] Nonetheless, circuit courts have concluded that "[t]he passage of time is not an insurmountable obstacle if sufficient contemporaneous information is available." *Reynolds*, 86 F.3d at 803 (finding that a four year lapse of time between the initial competency hearing and proposed retrospective hearing would not prevent an accurate assessment in light of the "the unusual amount of contemporaneous evidence specifically relating to [defendant's] competency."). *See also Maynard v. Boone*, 468 F.3d 665, 675 (10th Cir. 2006) (finding that an eight year lapse of time was not a bar to a retrospective competency hearing because the prior competency hearing records was substantial and the medical records were complete).

of Hatfield's competency completed by Dr. Haynes; an evaluation of Hatfield's competency completed by Mr. Watkins; a copy of a bail hearing transcript at which Dr. Gallemore testified regarding Hatfield's competency; Dr. Gallemore's one-page letter to Hatfield's attorney regarding Hatfield's competency; and an one-page letter from the State's psychiatrist. Rather than addressing Hatfield's mental competency, much of the medical evidence contained in the record concerns Hatfield's physical health after being shot by the police. A written evaluation of competency prepared by Dr. Gallemore, Hatfield's treating psychiatrist, is not included in the record. The report of the prosecution's psychiatrist, Dr. Smith, contains no supportive findings or explanation and his final report, which was the subject of the motion to continue, was not made a part of the appellate or habeas record.  In addition, because none of the medical experts was permitted to testify regarding competency, a retrospective reviewer is unable to determine the standard of competency against which the experts measured Hatfield or their experience and expertise in making such determinations. In short, the record is notably incomplete. The gaps in the record preclude a reliable retrospective assessment of Hatfield's competency to stand trial and to plead guilty. As Respondent aptly notes, "Hatfield is not only asking this Court to take up the issue of Hatfield's competency to plead or stand trial, from a cold record, he is asking this Court to do it twenty years after the fact." (Docket No. 20 at 8). The undersigned recognizes the difficulties inherent in making a retrospective determination even under the best of circumstances and, therefore, finds that such a determination in this case would be inherently unreliable. Consequently, in light of the present circumstances, the undersigned further finds that only appropriate remedy open to the court is to grant Hatfield's petition and set

aside Hatfield's convictions.

### **Proposal and Recommendations**

Therefore, the undersigned proposes that the presiding District Judge **FIND** that Hatfield's due process rights were violated as the Circuit Court of Wayne County failed to afford Respondent a reasonable opportunity to demonstrate that he was not competent to stand trial or enter guilty pleas and that Petitioner is entitled to judgment as a matter of law on that claim. Moreover, as a reliable retrospective review of Hatfield's competence at the time he entered his guilty pleas is unfeasible, the undersigned recommends that a writ of habeas corpus be issued and that Hatfield be released from state custody unless the State of West Virginia elects to promptly retry him.

The undersigned respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** as follows:

1. David Ballard, Warden of Mount Olive Correctional Complex be substituted as the Respondent, as he is the real party of interest;

2. Petitioner's Cross-Motion for Summary Judgment (Docket No. 28) be **GRANTED**;

3. Respondent's Motions for Summary Judgment (Docket Nos. 7 and 19) be **DENIED**; and

4. Petitioner's Petition for Writ of Habeas Corpus by a Person in State Custody (Docket No. 1) be **GRANTED;** his convictions be set aside and he be discharged from custody unless the State elects to timely retry him.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules

of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to the Petitioner, the Respondent, and any counsel of record.

**FILED:** October 3, 2011.

Cheryl A. Eifert
United States Magistrate Judge