**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

STEPHEN WESTLEY HATFIELD,

Petitioner,

v.                                              CIVIL  ACTION  NO.  3:09-0119

DAVID BALLARD, Warden of the
Mount Olive Correctional Complex,

Respondent.

**Memorandum Opinion and Order**

**I.  Introduction**

Before the Court is Stephen Wesley Hatfield's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (ECF No. 1), Respondent's Motions for Summary Judgment (ECF Nos. 7 and 19), and Petitioner's Cross-Motion for Summary Judgment (ECF No. 28).  The Petitioner in this case seeks a writ of habeas corpus declaring his present incarceration to be in violation of federal law.   Specifically, Mr. Hatfield contends that (A) he was not mentally competent at the time his original guilty plea was entered, (B) he was denied a full evidentiary hearing on the issue of his mental competency, and (C) that he was denied a full evidentiary hearing on the issue of his criminal responsibility.

By standing order, the Petition was referred to United States Magistrate Judge who, pursuant to 28 U.S.C. § 636(b)(1)(B), submitted her Proposed Findings and Recommendations. ECF No. 33 (hereinafter "PF&R").  The Magistrate Judge recommended that this Court (1) grant Petitioner's Motion for Summary Judgment; (2) deny Respondent's Motion for Summary Judgment; and (3) grant Petitioner's request for a Writ of Habeas Corpus and set aside his conviction and discharge

him unless the State elects to timely retry him.  Respondent filed timely objections to the PF&R.

The Court heard oral argument, and Respondent conceded that Petitioner never received a

constitutionally adequate competency hearing.  Instead, Respondent relied entirely on a procedural

default argument that was raised for the first time in the Respondent's objections to the PF&R.   In

light of Respondent's new emphasis on procedural default, the Court ordered supplemental briefing

on the issue.  Having received the supplemental briefs, this matter is now ripe for decision.  As set

forth in this Memorandum Opinion and Order, the Court **ADOPTS in part** the Magistrate's

Proposed Findings & Recommendations.  Petitioner's Motion for Summary Judgment (ECF No. 28)

is **GRANTED**; Respondent's Motions for Summary Judgment (ECF Nos. 7 and 19) are **DENIED**;

and the Petition for a Writ of Habeas Corpus (ECF No. 1) is **GRANTED**.  Petitioner's State

conviction is hereby set aside; Respondent is **ORDERED** to discharge Petitioner unless the State

of West Virginia elects to retry him in a timely fashion.

## II.  Background[1]

### A.     Factual Background

On May 8, 1988, Mr. Hatfield drove to the Wayne County home of his former girlfriend,

Tracey Andrews, and fatally shot her.  In the course of committing this crime, Mr. Hatfield also shot

and wounded Ms. Andrews' boyfriend, Dewey Meyers, and her neighbor, Roger Cox.[2]  Following

---

[1] This Section largely adopts the Magistrate Judge's undisputed account of the factual and procedural history of this case.  *See PF&R*, at 3–25.

[2] Both parties agree that the essential facts relevant to the present case are discussed in three decisions by the West Virginia Supreme Court involving Petitioner: *State v. Hatfield*, 413 S.E.2d 162 (W. Va. 1991); *State v. Hatfield*, 522 S.E.2d 416 (W. Va. 1999); and *Hatfield v. Painter*, 671 S.E.2d 453 (W. Va. 2008).  Hereinafter, these cases will be referred to as "*Hatfield I*," "*Hatfield II*," and "*Hatfield III*," respectively.

the shootings, Mr. Hatfield fled the scene and was eventually arrested by law enforcement officers after an exchange of gunfire. Police shot Mr. Hatfield several times in the abdomen and leg before managing to capture and disarm him. *Pet's Ex. 2*, ECF No. 28-2, at 2–6. As a result of his wounds, Mr. Hatfield was hospitalized at Cabell Huntington Hospital and underwent emergency surgery. *Id*. at 3–4. During his post-operative course, Mr. Hatfield attempted suicide by slashing his wrists and endeavoring to strangle himself with his central venous pressure catheter. *Id*. Consequently, his attending physician consulted the services of Dr. Johnnie L. Gallemore, Jr., a Marshall University psychiatrist and a member of the hospital's medical staff. Dr. Gallemore examined Mr. Hatfield and diagnosed him with severe depression of approximately two months duration. *Id*. at 9. According to Dr. Gallemore, Mr. Hatfield was seriously ill and remained a suicide risk. *Id*. *See also Resp's Ex. 14,* ECF No. 7-2, at 113. Dr. Gallemore initiated treatment and continued to care for Mr. Hatfield until his discharge from the hospital on June 4, 1988. *Pet's Ex. 2*, ECF No. 28-2, at 3. Upon discharge, Mr. Hatfield was taken into custody by the Wayne County Sheriff's Department to face charges related to the shootings. *Id*. A Wayne County Grand Jury ultimately returned a three count indictment against Mr. Hatfield, charging him with one count of first degree murder and two counts of malicious wounding.

## 1.      Mr. Hatfield's Commitment for Psychiatric Treatment and Evaluation

Shortly after Mr. Hatfield's release from Cabell Huntington Hospital, his defense counsel moved to have him hospitalized so that he could continue to receive psychiatric treatment. On June 10, 1988, the Honorable Robert G. Chafin, Judge of the Circuit Court of Wayne County, conducted a hearing on the motion. *Resp's Ex. 14,* ECF No. 7-2 at 109–43. At the hearing, Dr. Gallemore was called to testify regarding Mr. Hatfield's suicide attempt in the hospital, the diagnosis of major

depressive disorder, and his need for continued treatment.  *Id*. at 110–15.  Following this testimony, Judge Chafin granted the motion and committed Mr. Hatfield to Weston State Hospital "for examination, treatment and care for a period that is necessarily required for his psychiatric needs." *Pet's Ex. 3*, ECF No. 28-3.  The Court further ordered that an examination be performed at Weston State Hospital to determine, in relevant part, Mr. Hatfield's mental competency at the time of the alleged crimes and his competency to stand trial.  *Id*.

During Mr. Hatfield's commitment to Weston State Hospital, his competency was evaluated by Dr. Herbert C. Haynes, a psychiatrist, and Earnest Watkins, M.A., a licensed psychologist.  *See Pet's Ex. 8*, ECF No. 28-8, and *Pet's Ex. 9*, ECF No. 28-9.  On August 1, 1988, Dr. Haynes issued a twelve-page forensic evaluation in which he chronicled Mr. Hatfield's emotional collapse.  ECF No. 28-8.  Piecing together the events through a series of interviews, Dr. Haynes recounted Mr. Hatfield's story as follows:  Mr. Hatfield was a long-term employee of the United States Post Office and Vice-President of the Postal Workers Union.  He lived with the victim, Ms. Andrews, for a period of four years during which he supported her through beauty school and then the start of nursing school.  Mr. Hatfield described their lives as perfect.  On the Friday before April 1, 1988, Ms. Andrews told Mr. Hatfield that she was going out with a girlfriend.  She did not return home until Saturday night.  When she arrived, she told Mr. Hatfield that she was in love with another man, Dewey Meyers.  According to Mr. Hatfield, that was when "his world came crashing down on his head."  At first he did not believe her, but shortly thereafter, Mr. Meyers arrived and loaded some of Ms. Andrews' things in his car and took her away.  In the weeks that followed, Mr. Hatfield became desolate.  He started to drink heavily, although he had never been much of a drinker, and contemplated suicide.  He resigned as Vice-President of the Union, because he could no longer

think, concentrate, or function.  He spent increasing amounts of time alone at home, often pacing

from room to room.  Mr. Hatfield described the month before the shootings as "a daze."  He felt like

the "most miserable person on earth."  On the morning of May 8, 1988, Mr. Hatfield called Ms.

Andrews' mother to wish her a happy Mother's Day.  Ms. Andrews' sister answered the telephone

and, upon Mr. Hatfield's prodding, confirmed that Ms. Andrews was in love with Mr. Meyers.  Mr.

Hatfield's remaining hopes were crushed.  He decided he needed to speak with Ms. Andrews, but

was afraid of Mr. Meyers, so he got his gun before driving to Mr. Meyers' home.  Once there, he

saw Ms. Andrews and asked to speak with her.  She announced to Mr. Meyers that Mr. Hatfield was

there; Mr. Hatfield recalled seeing Mr. Meyers running toward him.  Mr. Hatfield's recollections

of the events thereafter were sketchy, but he admitted that he shot Ms. Andrews and the others.

After the shootings, Mr. Hatfield felt he had nothing to live for and just wanted to die.  He devised

a plan to have the police kill him, but he wanted to die at home, so he left the scene.  Mr. Hatfield

explained that he refused to relinquish his gun when the police surrounded him, because he hoped

that they would shoot him.  When they did not kill him, he tried to kill himself at the hospital.  He

told Dr. Haynes that if he could take a pill that would make him die, he would gratefully take it,

stating "I would welcome not being here . . . it's like going into another world and I can't get back."

*Id*.

    Based upon his interviews and examination, Dr. Haynes diagnosed Mr. Hatfield as suffering

from Major Depression with an intensely pronounced suicidal component triggered by the grief of

his girlfriend leaving him.  Dr. Haynes added that although "attempting to arrange one's death by

others may seem incomprehensible," Mr. Hatfield's plan to have the police kill him was consistent

with his intense suicidal intent.  *Pet's Ex. 8*, ECF No. 28-8, at 13.  Dr. Haynes opined that Mr.

Hatfield was not competent at the time of the alleged crimes "because of a mental disorder which grossly impaired his ability to conform his conduct to the requirements of the law." *Id.* Moreover, Dr. Haynes found that Mr. Hatfield was not competent to stand trial "[n]ot by reason of his lack of comprehension of criminal proceedings or from any impairment of his intelligence, which is at least above average, but from his Major Depression and intense need for punishment as extreme as death." *Id.*

On September 8, 1988, Mr. Watkins issued his forensic evaluation. In this twenty-page report, Mr. Watkins opined that Mr. Hatfield was competent to stand trial. He based his opinions on Mr. Hatfield's knowledge of courtroom proceedings and his scores on the Georgia Competency Test and Competency to Stand Trial: Assessment Instrument. *Pet's Ex. 9*, ECF No. 28-9, at 14. On the issue of competency at the time of the criminal acts, however, Mr. Watkins determined that Mr. Hatfield was not competent. He explained that Mr. Hatfield had experienced a major depressive episode on the day of the shootings and likely fired the first shot in a self-defense posture. Mr. Watkins concluded as follows:

> Stephen Hatfield experienced at least diminished capacity in terms of his ability to appreciate the wrongfulness of his conduct and/or to conform his conduct to the requirement of the law. Consequently, it is this evaluator's opinion that Stephen Hatfield is not criminally responsible for the crimes with which he has been charged.

*Id.* at 18. On September 27, 1988, Mr. Hatfield's counsel filed a motion requesting a hearing to determine his mental competency pursuant to W. Va. Code § 27-6A-1 *et seq.*[3] By this time, Judge

---

[3] W. Va.. Code § 27-6A-1 (1983) provided in relevant part:

(a) Whenever a court of record . . . believes that a defendant in a felony case . . . may be incompetent to stand trial or is not criminally responsible by reason of mental illness . . . it may at any stage of the proceedings after return of an indictment or

(continued...)

Chafin had recused himself from the case due to a conflict of interest and a Special Judge, Elliott E. Maynard, was appointed to preside over the matter. At the request of the Wayne County Prosecutor, Judge Maynard entered an Order on October 12, 1988 requiring Mr. Hatfield to be examined by Dr. Ralph S. Smith, Jr., a psychiatrist in South Charleston, West Virginia, for the purpose of determining his competency at the time of the crimes and his competency to stand trial. *Pet's Ex. 5*, ECF No. 28-5. A hearing on the issue of Mr. Hatfield's competency to stand trial was scheduled for January 27, 1989.

### 2. Competency "Hearing" and After

On January 27, 1989, Judge Maynard proceeded with the hearing to determine Mr. Hatfield's competency to stand trial. *Pet's Ex. 6*, ECF No. 28-6, at 2–9. The transcript of this hearing is eight pages long. *Id*. Six of the eight pages document a discussion between the Court, the Prosecutor, and defense counsel regarding "housekeeping" matters related to the scheduling of the trial and jury selection. *Id*. at 4–9. The remaining two pages memorialize the competency hearing. *Id*. at 2–4.

---

(...continued)
> issuance of a warrant or summons against the defendant, order an examination of such defendant to be conducted by one or more psychiatrists, or a psychiatrist and a psychologist.

W. Va.. Code § 27-6A-2 (1983) provided further:

> (a) At a hearing to determine a defendant's competency to stand trial, the defendant shall be present and he shall have the right to be represented by counsel and introduce evidence and cross-examine witnesses. The defendant shall be afforded timely and adequate notice of the issues of the hearing and shall have access to a summary of the medical evidence to be presented by the state. The defendant shall have the right to an examination by an independent expert of his choice and testimony from such expert as a medical witness on his behalf. All rights generally afforded a defendant in criminal proceedings shall be afforded to a defendant in such competency proceedings.

The hearing consisted of the Court's review of an unfinished report prepared by Dr. Smith, the prosecution's expert psychiatrist.   The report was submitted in letter form addressed to the Prosecutor.  It was dated January 23, 198 [sic] and stated in its entirety:

> My forensic evaluation of your client was completed October 21, 1988.  It is my opinion that Mr. Hatfield is competent to stand trial.  I am presently reviewing my records to determine whether or not he is criminally responsible.  My full report will follow.

*Pet's Ex. 10*, ECF No. 28-10.  After reviewing this letter, Judge Maynard found Mr. Hatfield competent to stand trial.  He explained his finding as follows:

> Based upon that report and on the facts and circumstances of this case that have been developed in the evidence so far, I will declare the defendant to be competent to stand trial and will order that he stand trial.  Show the objection of the defendant to my finding and ruling in that regard.

*Pet's Ex. 6*, ECF No. 28-6, at 4.  No witnesses testified at this hearing; accordingly, there was neither examination nor cross-examination of the mental health care professionals who had examined, evaluated, and treated Mr. Hatfield.  *Id.*  The detailed reports prepared by Dr. Haynes and Mr. Watkins were not mentioned.   Likewise, no writings or recordings were identified, authenticated, or properly admitted into evidence.  Mr. Hatfield was not given timely access to or notice of the medical evidence to be presented by the State.  He had no opportunity to testify on his own behalf.

Mr. Hatfield's trial was scheduled to begin on February 27, 1989.  One week after the competency hearing, on February 3, 1989, Dr. Gallemore wrote a letter to defense counsel expressing concern over Mr. Hatfield's deteriorating mental health.  *See Pet's Ex. 7*, ECF No. 28-7, and *Habeas Petition,* ECF No. 1, at 17.  Dr. Gallemore recommended that Mr. Hatfield be hospitalized in a psychiatric inpatient facility where he could receive electric convulsant treatments.

-8-

Five days later, Mr. Hatfield attempted suicide in the Wayne County Jail by taking an overdose of narcotics and antidepressants.  *Id.*

### 3.      Guilty Plea and Sentencing

Mr. Hatfield's trial began as scheduled on February 27, 1989.  Immediately before picking a jury, Judge Maynard heard pre-trial motions, including a motion by Mr. Hatfield to continue the trial date.[4]  *Resp's Ex. 16*, ECF No. 19-3.  After Judge Maynard denied the motion, defense counsel advised the Court and Prosecutor that Mr. Hatfield wished to solicit a plea agreement, and that he wanted to plead guilty to first degree murder in exchange for the Prosecutor's recommendation of mercy.  At the same time, defense counsel informed the Court that two of Mr. Hatfield's psychiatrists felt that Mr. Hatfield was not competent to enter a guilty plea. *Id.* at 18–19.  Moreover, defense counsel urged Mr. Hatfield not to plead guilty, but their client was adamant on entering the plea even against the advice of counsel.  *Id.* at 24.

After allowing the parties an opportunity to discuss a plea agreement, the Court resumed proceedings.  According to defense counsel, Mr. Hatfield still wished to plead guilty even though the Prosecutor would not agree to recommend mercy.  In an effort to determine if Mr. Hatfield was competent to enter a guilty plea, the Court questioned him at length.  *Id.* at 26–43.  Mr. Hatfield contended that he was competent and understood the consequences of a guilty plea.  The Court then addressed defense counsel, who reiterated that Mr. Hatfield's psychiatrists felt he was not competent to enter a plea.  In light of Mr. Hatfield's multiple suicide attempts, the psychiatrists feared that

---

[4] Mr. Hatfield's trial counsel objected to the untimely disclosure of Dr. Smith's final written opinion on their client's competency at the time of the shootings. Defense counsel did not receive the opinion until six days prior to trial and argued that they needed additional time to rebut it.

entering a guilty plea might simply constitute another attempt at suicide.  *Id*. at 46–48.  Subsequent

to these conversations, Judge Maynard stated:

> [Mr. Hatfield] is competent to enter the plea based on what I've heard here, and notwithstanding — apparently there are psychiatrists going to say opposite things about his competency.
>
> The defendant has some psychologists and/or psychiatrists who are going to say he is not competent.  The State has some, or one in particular, who is going to say this man is competent.
>
> I'm not sure that lay judgments of competency aren't better than what the so-called professional gives us . . . I think he's competent to make this decision [to plead guilty] and to make this move and I'm going to attempt to take his plea from him.

*Id*. at 50.  Accordingly, Mr. Hatfield pled guilty to one count of first degree murder and two counts

of malicious wounding and was convicted of those crimes by Order of the Circuit Court entered on

March 15, 1989.  *Resp's Ex. 2*, ECF No. 7-1 at 5–7.

On December 6, 1989, Judge Maynard conducted a sentencing hearing.  *Pet's Ex. 13*, ECF

No. 28-13.  Mr. Hatfield's psychiatrists, Dr. Gallemore and Dr. Haynes, were offered to testify

concerning their evaluation, care and treatment of Mr. Hatfield.  *Id*. at 2–19.  Neither witness was

permitted to testify regarding Mr. Hatfield's competency on the date of the murders or at his plea

hearing.  At the conclusion of the hearing, Judge Maynard sentenced Mr. Hatfield to life in prison

without mercy on the count of murder and two 2-10 year sentences for each of the malicious

wounding counts, all to be served concurrently.  *Id*. at 31–33.

On December 18, 1989, Dr. Gallemore wrote another letter to defense counsel summarizing

his contacts with Mr. Hatfield and restating his impression that Mr. Hatfield's "choice to plead

guilty to charges against him was significantly affected by his illness and that he lacked the capacity

on February 27, 1989 to intelligently and knowingly enter a plea of guilty to these charges."  *Pet's*

*Ex. 7*, ECF No. 28-7.  Dr. Gallemore reiterated his opinion that Mr. Hatfield likewise lacked capacity to appreciate the nature of and control of his acts on the day of the crimes.

**B.      Procedural History**

**1.      *Hatfield I* - Hatfield's First Direct Appeal to the West Virginia Supreme Court**

Mr. Hatfield filed a petition appealing his conviction and sentence in the West Virginia Supreme Court on December 10, 1990.  *Resp's Ex. 4*, ECF No. 7-1, at 15–49.  Mr. Hatfield argued, *inter alia*, that the trial court erred by accepting his guilty pleas without first ensuring his competency to stand trial.[5]  The West Virginia Supreme Court found error in the trial court's

---

[5] Mr. Hatfield asserted three challenges:

A.      Whether the court erred in accepting defendant's pleas of guilty as he was incompetent at the time the pleas were entered.

(1) Whether the court erred in finding the defendant competent under the standards set forth in West Virginia Code, Sections 27-6A-1, 2.

(2) Whether the court erred in accepting defendant's pleas of guilty without reconsidering defendant's mental competence given the defendant's subsequent attempt at suicide and the additional psychiatric evidence tendered after the court's finding of competence.

B.      Whether a sufficient factual basis was presented to the court to sustain convictions for murder in the first degree and malicious assault.

(1) Whether the factual basis presented by the defendant on the charge of first degree murder was sufficient to support defendant's plea.

(2) Whether the factual bases presented by defendant on the charges of malicious assault were sufficient to support defendant's pleas.

C.      Whether the court abused its discretion in denying defendant's motion for a continuance to allow receipt of newly available records and to allow enforcement of a subpoena.

(continued...)

-11-

acceptance of Mr. Hatfield's guilty pleas and remanded the case with instructions. *Hatfield I,* 413 S.E.2d 162, 167 (W. Va. 1991). In particular, the West Virginia Supreme Court expressed concern that Mr. Hatfield's guilty pleas were entered after a second attempt at suicide and against the advice of counsel. Citing state and federal case law, the Court observed that "[i]t is a fundamental guaranty of due process that a defendant cannot be tried or convicted for a crime while he or she is mentally incompetent." *Id.* at 169 (citations omitted). The Court recognized that "[g]enuine attempts at suicide constitute evidence of irrational behavior. When these acts are brought to the attention of a trial judge, he should order a psychiatric examination of a defendant." *Id.* at 163, Syl. Pt. 2 (citations omitted). Citing to its decision in *State v. Cheshire,* 292 S.E.2d 628, 630 (W. Va. 1982), the Court confirmed that "the test for mental competency to stand trial and the test for mental competency to plead guilty are the same;" therefore, the statutory process delineated in W. Va. Code § 27-6A-1 *et seq.* was applicable "to a determination of a defendant's competence to enter a guilty plea." *Hatfield I*, 413 S.E.2d 162, Syl. Pt. 4 (citation omitted).

Although Mr. Hatfield brought the issue squarely before the Court, the West Virginia Supreme Court did not explicitly address the adequacy of the trial court's *original* determination of competency. Instead, the Court focused on the failure of the trial court to reassess Mr. Hatfield's competency during the plea colloquy, stating:

> *Where a circuit court has found that a defendant* in a criminal case where the possible punishment is life imprisonment without mercy *is competent to stand trial*, but subsequent to the competency hearing, the defendant attempts to commit suicide, then against advice of counsel indicates his desire to plead guilty to the charges in the indictment, before taking the plea of guilty, the trial judge should make certain inquiries of the defendant and counsel for the defendant in addition to those

---

[5](...continued)
*Resp's Ex. 4*, ECF No. 7-1, at 17.

> mandated in *Call v. McKenzie,* 159 W. Va.. 191, 220 S.E.2d 665 (1975).  The Court
> should require counsel to state on the record the reason why counsel opposes the
> guilty plea.  The Court should then ask the defendant to acknowledge on the record
> that he understands his counsel's statements and if in view of them he still desires
> to plead guilty.  If the defendant then states that he still desires to plead guilty, the
> court may then accept the plea.

*Hatfield I*, 413 S.E.2d at 169 (emphasis added).  It is clear from the emphasized text that, for

purposes of this decision, the West Virginia Supreme Court presumed the validity of the trial court's

initial competency determination.

On December 19, 1991, the West Virginia Supreme Court issued a mandate order confirming

"that there is an error in the judgment of the Circuit Court of Wayne County, rendered on the 3rd

day of January, 1990" and directing that the judgment be "set aside, reversed and annulled" and the

case be "remanded to the Circuit Court of Wayne County for further development according to the

principles stated and directions given in the written opinion. . ."  This order was recorded in the

Circuit Court of Wayne County on February 7, 1992.  *Resp's Ex. 5*, ECF No. 7-1 at 51.

### 2.      The Proceedings on Remand

A hearing held by Judge Maynard on December 11, 1996 appears to be the first activity in

the case after the West Virginia Supreme Court's mandate order.  Except for a passing reference to

a hearing in 1994 that had to be cancelled due to a snowstorm, no explanation has been offered for

the nearly five year delay between the West Virginia Supreme Court decision in *Hatfield I* and the

resumption of proceedings below.  At the December 11, 1996 hearing, when Mr. Hatfield was

represented by Thomas Smith, the parties agreed that a psychiatric evaluation of Mr. Hatfield's

current competency would be appropriate.  The trial court, sua sponte, also ordered a retrospective

review of Mr. Hatfield's competency at the time of the 1989 plea hearing.  The Court directed that

Dr. Ralph Smith, the prosecution's expert, conduct the evaluation of Mr. Hatfield and also perform

the retrospective review.  Mr. Hatfield did not object to a current competency evaluation, but did

object to the retrospective review.  *Resp's Ex. 18*, ECF No. 7-4, at 39–41.  The very next day,

Attorney George Morrone, who was not Mr. Hatfield's attorney of record and was not present at the

hearing, sent a letter to Judge Maynard which caused the Judge to hold a telephone conference on

December 13th.[6]  *Resp's Ex. 18*, ECF No. 7-4, at 38.  On this call, Judge Maynard and the attorneys

discussed the proper course of action in light of *Hatfield I*.  Darrell Pratt, the Prosecutor, stated:

> **Mr. Pratt:** I believe on the part – on the initial part of this order we all agreed on;
> that before we could proceed anywhere we though that there probably should be
> another evaluation to determine whether Mr. Hatfield is competent at the present
> time and I think we all agreed on that.

> **The Court:** I think that's true.

> **Mr. Pratt:** And the psychiatric evaluation set for the 17th;

> **The Court:** And I tried to put it in the record that way.  Part of it everybody agreed
> on and part of it – the part about if the psychiatrist could go back now to six or seven
> years and reconstruct, that part we didn't agree on, but let me – there also had been
> some discussion about a possible plea the other day –

> **Mr. Pratt:** – Yes.

> **The Court:**  – And I was told there were plea negotiations going on and I was told
> this by both lawyers, and I think Mr. Hatfield was present, at least when that was told
> to me, and I think everybody agreed, in view of what happened the last time in his
> case – I don't think – I certainly wouldn't be willing to accept a plea and I don't
> think anybody would want to offer one without an up to date evaluation and that was
> one of the purposes for the evaluation and the second purpose, if I could have gotten
> it out of the psychiatrist, I don't know if he could do it or not, but if I could have
> gotten it out of him I wanted his evaluation of the Defendant's competency to enter
> the plea that he entered back in 1989 or 1990, whatever year it was.

> **Mr. Smith [Defense Counsel]:** Your honor, Smith again; Trey [Mr. Morrone], that
> is an accurate, both between Darrel and the Judge, an accurate reflection of what

---

[6] The transcript indicates that Mr. Hatfield was not included in this proceeding, which was
conducted by telephone conference.

occurred the other day.  We objected, as the Judge noted, to any attempt by Dr. Smith to determine Mr. Hatfield's competence back in 1989, but agreed that a determination of present competence to enter into an agreed upon plea was appropriate.

*Resp's Ex. 19*, ECF 7-4 at 48–49. Mr. Morrone then explained his letter, and his understanding of

Petitioner's objection as follows:

> **Mr. Morrone:** Okay.  This is Morrone.  I agree with that and I can only say that the picture that was painted to me yesterday – Mr. Hatfield called here several times yesterday very upset – was different than what I'm hearing.  Obviously, I have three attorneys, obviously all of which are in agreement; and I have no question of the integrity of, and I believe an evaluation of the current condition before a remand hearing takes place is appropriate and that's not what he understood and I think the retroactive – you know – determination of February 1989 was the biggest thing he was concerned about was Ralph Smith doing that evaluation, but he did not tell me that was objected to and that was not part of the order.

*Id*.  Based on the unanimous agreement for the need for an evaluation, albeit with a dispute about

a retrospective competency determination, Judge Maynard then decided that any evaluation was

"pointless," and neither the current evaluation nor the retrospective review was completed.  *Resp's*

*Ex. 19*, ECF 7-4 at 53.  When counsel began renewed plea negotiations, the trial judge intervened:

> **Court:**  Let me stop you at this point.  You gentlemen are going to waste your time doing any plea negotiations in this case with me.  As far as I'm concerned, given the developments in this case, I took a plea from [Petitioner] once when he had disagreements with his lawyers about what was going on and I don't intend to do that again.  I'm going to cancel the evaluation.  I'm not – the main purpose of the evaluation was to see if he could enter a plea.  I'm not going to accept any plea.  I'm going to – this hearing we've got scheduled, we'll go ahead and have that hearing. . . I'll control the direction of that hearing and it is my intention at that hearing to try to comply with the opinion order of the Supreme Court entered in this case several years back and that's what I'm going to do. . . .

> **Mr. Smith [Defense Counsel]:**  Judge, Smith here; Since I spoke with the Court and initially spoke with [the Prosecutor], I spoke with [Petitioner] who . . . tells me that he did not have a complete. . . a complete understanding of what's going on and it is my understanding now that were the Court to reconsider and allow him to be evaluated he would be evaluated and would cooperate and if deemed to be competent try and proceed and would not have any disagreements with his lawyers on that.

> **Court:** But I have other cases and other fish to try and I'm trying my best to comply with this order that I should have complied with years ago.

After discussing scheduling matters, defense counsel continued:

> **Mr. Smith:** I understand the Court's unwillingness at this point to consider a plea, but if, in fact, [Petitioner] is willing to go ahead and cooperate in the evaluation, might it not be a bad idea – a good idea, rather, to go ahead and do that just so we'll have it in the file in case circumstances change?

> **Court:** Well, he also has – he voiced the other day a very strong objection to Dr. Smith and that's the only person I think we could have gotten at this point to do an evaluation and I'm not going to let him create error in this record by now submitting to an evaluation by a doctor he says he objects to and has strong objections to and let him subsequently enter some plea he's going to attack because when he's got his next set of lawyers, when he says you fellows let him down, that is Mr. Smith and Mr. Morrone – I think at this point, given the structure of the record and of the events that have occurred, an evaluation is pointless and I'm going to do what I've indicated I'm going to do with this case . . . .  I want to say this.  Mr. Hatfield had his opportunity to have an evaluation.  His conduct with the events that led to this letter from Mr. Morrone have made an evaluation pointless, in my view.

*Id*. at 50–54.  Therefore, despite the fact that Mr. Hatfield had continued to receive psychiatric treatment while in prison, *see, e.g. Pet's Ex. 2*, ECF 28-2, at 42–47, and agreed to a psychological evaluation, his competency to stand trial or enter a plea was not evaluated on remand.

On December 19, 1996, Judge Maynard conducted a hearing to accomplish the Supreme Court's directive set forth in *Hatfield I.  Resp's Ex. 20*, ECF 7-4 at 60–109.  At the hearing, Mr. Hatfield's former trial counsel[7] stated that they did not believe Mr. Hatfield was competent at the time he entered guilty pleas.  They emphasized that shortly before the plea hearing Mr. Hatfield's

---

[7] In 1988 and 1989, Petitioner was represented by Mr. Lafe Chafin and Mr. Ray Hampton. These attorneys represented Petitioner at the time of his plea and sentencing hearings. Mr. Chafin and Mr. Hampton did not represent Petitioner in either of his appeals or in his habeas actions.

psychiatrists, Dr. Haynes and Dr. Gallemore, expressed opinions that Mr. Hatfield was not competent to stand trial or enter a plea. *Id*. at 67–70. Mr. Chafin told the Court:

> **Mr. Chafin:** I was of the opinion at that time, my own personal opinion, that Mr. Hatfield was not competent. I had been of that opinion for some time. It was based upon a report from one psychiatrist that was acted at the state's request. It was based upon a report and a number of conversations held with Dr. Gallemore. The most recent immediately prior to the plea in this case, the most recent conversation, as I recall with Dr. Gallemore having taken place here in this courthouse on the morning or the day of the plea. This young man was hellbent on self-destruction. That was in my mind from shortly after I took to represent him. That was about the only thing he was interested in, was self-punishment . . . . He subsequently attempted suicide while he was confined here prior to trial. I don't believe he was interested or acclimated one way, in one instance, as to what he was doing when he manifestly, strongly indicated his desire to enter a plea of guilty.

*Id*. at 68–69. Following counsel's testimony, Judge Maynard addressed Mr. Hatfield directly:

> **Court**: The [Supreme Court] directs me to ask the defendant first, to acknowledge on the record that he understands his counsel's statements. So I will ask you now, Mr. Hatfield, sir, do you think you are competent today?
>
> . . .
>
> **Mr. Hatfield**: Yes, sir, I feel competent today, your Honor.
>
> **Court**: Okay. Mr. Hatfield, then, in view of that, I would like to ask you, sir, if you can acknowledge on the record that you understand what [trial counsel] Mr. Chafin just now said. He was your counsel at the time.
>
> . . .
>
> **Mr. Hatfield**: Yes, I understand what Mr. Chafin said, your Honor.
>
> **Court**: Then, based on that, based on what your lawyer has said, and your acknowledgment that you understand it, do you still desire to plead guilty?
>
> **Mr. Hatfield**: No.
>
> **Court**: Do you want to withdraw this plea and stand a jury trial?
>
> **Mr. Hatfield**: Yes, I do, your Honor.

*Id.* at 73–74.  The Court then asked for the State's position.  The Prosecutor argued that the original guilty pleas should stand, indicating that he saw "nothing in [Mr. Hatfield's] demeanor or actions that indicate that he is more competent today than he was the date that he stood before the Court and stated clearly his intention to enter a plea of guilty."  The Court agreed, stating in relevant part:

> **Court:**  Well, this is very difficult.  It's difficult because the procedure that has been followed in this case subsequent to the plea, is not one that is extremely logical to me.  In fact, what it appears to do tactically, is to give the defendant two bites at the apple.

> **Court:**  Simply put, he pled guilty, took his chances, the consequences were more severe than he anticipated.  So now he wants to withdraw the plea and start all over . . . .  Anytime [Mr. Hatfield] enters a plea, let's assume that you withdraw this plea and allow him to enter some subsequent plea, the ink wouldn't be dry on the plea forms before he would be back before the Supreme Court asserting, once again, that he wasn't competent to enter this plea.  So he would have a third bite of the apple.  At some point in our jurisprudence there needs to be an end to things . . . .  I do not think that the [Supreme] Court's direction to the trial court here is to give the defendant the opportunity to have his cake and eat it too, as we say in the southern Appalachian mountains.

> I find nothing here today that should cause a different result than we had at the time this man entered his plea, and accordingly, I am going to, once again, determine that the plea was freely and voluntarily made at a time when the defendant was fully competent to enter it, and will ratify the sentence imposed at the time sentence was imposed.  That will conclude this matter.

*Resp's Ex. 20*, ECF No. 7-4 at 73–84.  On January 28, 1998, more than one year later, Senior Judge James Holliday entered an order making similar findings, denying Mr. Hatfield the right to enter pleas of not guilty and reimposing his original sentence.  *Resp's Ex. 6*, ECF No. 7-1 at 62–64; *see also Hatfield II*, 522 S.E.2d at 417.  No explanation has been offered for Judge Maynard's failure to enter this Order himself.

### 3.      *Hatfield II* - Mr. Hatfield's Second Direct Appeal to the West Virginia Supreme Court

On June 15, 1998, Mr. Hatfield appealed the trial court's order to the West Virginia Supreme Court. In the main, Mr. Hatfield argued that Judge Maynard (1) failed to follow the express directives of *Hatfield I*, which vacated the convictions and provided Mr. Hatfield with an opportunity to plead again; and (2) denied Mr. Hatfield due process of law by refusing to accept his plea of not guilty.[8] *Hatfield II*, 522 S.E.2d 416, 417 (W. Va. 1999). The petition for appeal was accepted on October 8, 1998. *Id.* By a 3-2 majority, the West Virginia Supreme Court affirmed the trial court's order in a *per curiam* opinion.[9] Although the Court conceded that "the remand was clearly for a determination on whether the Appellant was competent on the date he originally entered his guilty pleas," the Court never addressed the failure of the trial court to hold a statutorily-mandated evidentiary hearing on competency, either prior to the guilty pleas or on remand. Choosing to ignore the essential due process argument, the majority reconstructed the appeal, identifying "the sole issue before the Court" to be "whether this Court in *Hatfield I* vacated the Appellant's earlier guilty pleas or simply ordered the lower court to reconsider the Appellant's guilty pleas in light of more fully developed evidence." *Id.* at 419. The majority then presented multiple arguments to support its finding that Mr. Hatfield's appeal was "outlandish." *Id.* When confronted with the mandate order setting aside, reversing, and annulling the convictions, the Court explained in a footnote that the mandate order was "simply incorrect and the discrepancy went unnoticed until

---

[8] Mr. Hatfield reminded the West Virginia Supreme Court that in his first appeal he "raised numerous issues . . . only two of which, the sufficiency of the plea colloquy and the sufficiency of the factual basis provided, were decided as the former issue was seemingly dispositive." The sufficiency of the original competency hearing was one of the unaddressed issues.

[9] By this time, Elliot E. Maynard had been elected to the West Virginia Supreme Court and recused himself from the case. Judge Danny Cline heard the case in his place. *Hatfield II*, 522 S.E.2d at 421.

it was brought to the Court's attention by Appellee." *Id*.  After citing *Hatfield I*'s finding that there was a factual basis to support Mr. Hatfield's guilty plea, the Court stated, "[o]bviously, had the Court vacated the guilty pleas, there would have been no need to uphold the factual basis for accepting the guilty pleas." *Id*. at 421.  The Court emphasized that remand was "for further development of the record" and was not intended to "give Appellant an opportunity to withdraw his original guilty pleas."  The West Virginia Supreme Court concluded that the trial court attempted to develop the record by requesting Dr. Smith to perform a retrospective evaluation of Mr. Hatfield's competence, but Mr. Hatfield refused to undergo further psychological evaluation.  Thus, the trial court proceeded to hold a hearing and followed the West Virginia Supreme Court's directive at the hearing by developing the record through the statements of counsel.  Accordingly, the opinion concluded, Mr. Hatfield's due process rights were not violated.[10]  *Id*. at 420.

Chief Justice Starcher, joined by Justice McGraw, wrote a vigorous dissent in which he underscored the fundamental defect in the majority's opinion; that being that "[n]o competency hearing has ever been held regarding [Mr. Hatfield]."  Justice Starcher observed:

> It is axiomatic that the conviction of a legally incompetent defendant ***or the failure of the trial court to provide an adequate competency determination violates due process by depriving the defendant of his constitutional right to a fair trial.***

*Hatfield II*, 522 S.E.2d at 422 (W. Va. 1999) (Starcher, C.J., dissenting) (emphasis added).  The dissent further disagreed with the majority's position that the purpose of remand in *Hatfield I* was

---

[10] The majority does not comment on the reason for Mr. Hatfield's objection to Dr. Smith or the apparent inequity in having Dr. Smith conduct a retrospective competency evaluation when he, acting as the prosecution's expert, had previously found Mr. Hatfield competent to stand trial. Further, as noted by the dissent, the Court simply side-stepped the unsettling truth: that Mr. Hatfield had not yet received an adequate competency hearing despite ongoing concerns regarding his mental health.

to allow a retrospective competency hearing, pointing out that if the West Virginia Supreme Court had wanted a retrospective competency hearing, it would have specifically directed that one be completed, as it had in other opinions, including *State v. Cheshire,* 292 S.E.2d 628 (W. Va. 1982), a case heavily relied upon by the State. The dissent added that even if that were the intent of the remand, the trial court failed to follow the directive because "[i]n spite of additional evidence presented upon remand that the appellant was not competent on February 27, 1989 — as testified to by his trial counsel at the December 19, 1996 hearing — the circuit court found that he was competent." *Id.* Emphasizing that the statements of counsel were the only evidence offered on remand, the dissent observed that the trial court inexplicably determined that Mr. Hatfield was competent "based only upon *prima facie* evidence [that] the appellant was not competent." *Id.* at 422. The dissent concluded that the unambiguous intent of the West Virginia Supreme Court's order in *Hatfield I* was to vacate Mr. Hatfield's convictions, stating "the language in *Hatfield I* makes it clear that the court determined the plea colloquy to be incomplete, and as a consequence the conviction was constitutionally infirm." *Id.* at 422. To bolster his position, Justice Starcher took the unusual step of incorporating into the dissent an affidavit prepared by former Justice Richard Neely.[11] *Id.* at n. 1.

### 4.     Mr. Hatfield's State Habeas Petition

---

[11] Justice Neely participated in the hearing of *Hatfield I.* His affidavit included the following relevant averments:  The holding of the court was that on the facts presented the plea colloquy was insufficient . . . Under the decision, if Mr. Hatfield had opted to persist in his plea of guilty, the court could have accepted the plea after a full and fair colloquy.  However, it was my intention that if Mr. Hatfield declined to plead guilty the counts would be tried . . . The court's opinion in *Hatfield II* states in a footnote that the judgment order in the case which "set aside, reversed and annulled" Mr. Hatfield's conviction was a mistake.  I would respectfully disagree and note that the judgment order is consistent with the opinion and that, had a majority of the court opted to affirm the convictions, I would have dissented.

Upon denial of his direct appeal, Mr. Hatfield filed a petition for a writ of habeas corpus in the Circuit Court of Wayne County, West Virginia.[12]  *Resp's Ex. 9*, ECF No. 7-2 at 2–47.  Mr. Hatfield argued generally that his incarceration violated his "constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article III, Sections 1, 5, 10, and 14 of the West Virginia Constitution."  *Id*. at 8.  Recognizing that the current Wayne County Circuit Court Judge was the former Prosecutor in Mr. Hatfield's criminal action, the West Virginia Supreme Court appointed a Special Judge, Jay M. Hoke, to preside over the habeas proceedings.  On April 2, 2004, Judge Hoke ordered that all of the relevant medical and psychological documents in Mr. Hatfield's file be submitted to an independent psychiatrist, Dr. Delano H. Webb, for a retrospective opinion regarding Mr. Hatfield's mental competency at the time

─────────────────────

[12]  Petitioner asserted the following errors:

1.    Petitioner was not mentally competent at the time his original guilty plea was entered;

2.    Petitioner was denied a full evidentiary hearing on the issue of his mental competency, where witnesses would have testified under oath, Petitioner could have presented evidence to support his defense and Petitioner could have cross-examined and otherwise confronted the witnesses on this critical issue;

3.    Petitioner was denied a full evidentiary hearing on the issue of his criminal responsibility, where witnesses would have testified under oath, Petitioner could have presented evidence to support his defense and petitioner could have cross-examined and otherwise confronted the witnesses on this critical issue;

4.    Petitioner was denied effective assistance of counsel;

5.    Petitioner was denied due process because the circuit court's decision on remand and the West Virginia Supreme Court's decision in *Hatfield II* directly contradicted the clear holding in *Hatfield I*; and

6.    The trial court improperly sentenced Petitioner to life without possibility of parole "without applying any recognized standard."

*Resp's Ex. 9*, ECF No. 7-2, at 8, 34, 38, 41.

the crimes were committed and at the time of his guilty pleas. *Order*, ECF No. 1-7, at 9. On June 29, 2004, Dr. Webb issued a report finding that Mr. Hatfield "was not mentally competent at the time the crime was committed. Further, he was not mentally competent at the time he entered his guilty plea." *Id.* On January 31, 2005, Judge Hoke granted Mr. Hatfield's petition for writ of habeas corpus and set aside his conviction. *Resp's Ex. 10*, ECF 7-2, at 50–51. Judge Hoke ordered that before the State could proceed against Mr. Hatfield on the original indictment, he would be entitled to an examination to determine his mental competency and a competency hearing pursuant to W. Va. Code § 27-6A-1 *et seq. Id.*

On March 16, 2007, in an effort to address a motion filed by the Respondent pursuant to West Virginia Rule of Civil Procedure 52,[13] Judge Hoke entered a supplemental order granting habeas relief. *Id.* at 52–67. In this order, Judge Hoke specifically found, *inter alia*, that (1) on January 27, 1989, a hearing on Mr. Hatfield's competency to stand trial was held. "However, at this hearing, not a single witness testified under oath, not a single witness was subjected to cross-examination, and, in fact, no sworn testimony of any kind was considered by the trial court;" (2) the trial court declared Mr. Hatfield competent based upon a one paragraph letter from the State's expert "and without making any reference to the contrary opinions expressed by both psychiatrists, Herbert Haynes, M.D. and Johnnie Gallemore, M.D.;" (3) Mr. Hatfield attempted suicide after the competency hearing; (4) Mr. Hatfield decided to enter guilty pleas to all charges contained in the indictment against the advice of counsel; (5) Dr. Gallemore and Dr. Haynes believed Mr. Hatfield was not competent to stand trial at the time of the plea hearing; (6) Mr. Hatfield's attorneys likewise

---

[13] West Virginia Rule of Civil Procedure 52 provides, in relevant part: "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon . . . ."

did not believe Mr. Hatfield was competent to stand trial at the time of the plea hearing; (7) two

psychiatrists and a psychologist opined that Mr. Hatfield was not mentally competent at the time the

crimes were committed; and (8) Dr. Webb made a retrospective finding that Mr. Hatfield was not

mentally competent at the time of the crimes or at the time of the plea hearing.  *Id*.  Judge Hoke

added that:

> neither the decision by the West Virginia Supreme Court in *Hatfield I* nor *Hatfield
> II* addressed the specific due process issue raised in Hatfield's habeas corpus
> petition.  Thus, this habeas corpus proceeding is the first opportunity a court has had
> to address whether or not Petitioner's due process rights were violated when the trial
> court determined his mental competency without holding a full evidentiary hearing
> on the issue.

Judge Hoke concluded, "[u]nless and until Hatfield has been afforded the full evidentiary hearing

required constitutionally, his conviction is invalid and must be set aside."  *Id*. at 64.

### 5.    *Hatfield III* – Respondent's Appeal to the West Virginia Supreme Court

Respondent appealed Judge Hoke's decision to the West Virginia Supreme Court on July 27,

2007, arguing that even if the failure of the trial court to conduct an evidentiary hearing on Mr.

Hatfield's competency was improper, the error was rectified and rendered harmless on remand when

the trial court conducted further inquiry at the hearing held on December 19, 1996.  *Resp's Ex. 11*,

ECF No. 7-2, at 69–88.  On November 12, 2008, the West Virginia Supreme Court issued an opinion

reversing Judge Hoke's order granting habeas relief to Mr. Hatfield and remanding the case to the

Circuit Court for proceedings consistent with the opinion.  *Hatfield III*, 671 S.E.2d 453 (W. Va.

2008) (*per curiam*).[14]  Although this was the first time the West Virginia Supreme Court directly

acknowledged Mr. Hatfield's allegation that he was "denied a full evidentiary hearing on the issue

---

[14]  Chief Justice Maynard recused himself from the case.  *Id*. at 69.

of competency," the Court contended that the habeas action was "*not* the first opportunity a court had to address whether the defendant's due process rights were violated when the trial court determined his mental competency without holding a full evidentiary hearing on the issue." *Id*. at 463. Finding that it had previously considered the due process issues, the West Virginia Supreme Court determined that Mr. Hatfield was barred by the "law of the case" doctrine from raising them again in his petition for writ of habeas corpus. *Hatfield III*, 671 S.E.2d at 463. The Court explained:

> Implicit and explicit in *Hatfield I* and *Hatfield II* was this Court's concern with whether due process protections were implemented in accepting the defendant's guilty plea. Such a determination necessarily included an analysis of the defendant's competency at the time he entered the guilty plea. Thus, the circuit court in the habeas corpus proceeding was bound by the decisions previously reached by the circuit court in the criminal proceeding, which were affirmed by this Court. The circuit court in the habeas proceeding was without authority to address the issue of the defendant's competency at the time he entered his guilty plea.

*Id*. The Court stressed that Mr. Hatfield had refused to participate in a psychological evaluation after the remand in *Hatfield I*. Therefore, Mr. Hatfield created the error about which he now complained. The Court summarized, "because the error, if any, was created by the defendant in his refusal to participate in further psychological testing, he has waived any claims he had regarding such error." *Id*. at 464. On remand, the Circuit Court of Wayne County reinstated Mr. Hatfield's original convictions and sentence on December 12, 2008. *Resp's Ex. 15*, ECF No. 7-2 at 106–07.

### 6.    Mr. Hatfield's Present Federal Habeas Petition

On February 10, 2009, Mr. Hatfield filed the present petition for habeas relief pursuant to 28 U.S.C. § 2254. *Petition*, ECF No. 1. Pursuant to a standing order in this district, the case was referred to a Magistrate Judge for proposed findings of fact and recommendations for disposition. *Standing Order*, ECF No. 2. A response was filed on April 1, 2009 generally denying any violation of Mr. Hatfield's constitutional rights, but conceding that his petition was timely filed and he had

colorably exhausted his State remedies.  *Response*, ECF No. 6 at 1–2.[15]  Respondent also filed a

Motion for Summary Judgment and accompanying memorandum. ECF Nos. 7 and 8.

This action was stayed on May 29, 2009, to allow Mr. Hatfield the opportunity to present

new evidence to the West Virginia Supreme Court, which had not been considered in *Hatfield III*.

*Order*, ECF No. 13, at 1–2.  Mr. Hatfield subsequently filed a motion to reopen the action, which

this Court granted.  ECF Nos. 15 and 18.  Respondent re-filed his Motion for Summary Judgment

and accompanying memorandum and Mr. Hatfield filed a Cross-Motion for Summary Judgment,

both of which were fully briefed.  The Magistrate Judge conducted a thorough analysis of the factual

and procedural history of the case, much of which has been incorporated into this Memorandum

Opinion and Order.  Ultimately, the Magistrate Judge recommended granting Petitioner's Motion

for Summary Judgment and ordering that he be released or timely retried.  Respondent filed timely

objections to the PF&R in which he raised, for the first time, the issue of procedural default.  The

Court heard oral argument, and Respondent conceded that Petitioner never received a

constitutionally adequate competency hearing.  Instead, Respondent relied entirely on the new

procedural default argument that was first raised in his objections.   In light of the Respondent's new

emphasis on procedural default, the Court ordered supplemental briefing on the issue. This case now

being ripe for decision, the Court rules as follows.

### III.  Discussion

### A.    Procedural Default

---

[15]  Respondent reserved the right to file a further answer on the issue of exhaustion if this Court denied Respondent's Motion for Summary Judgment.  *Id.* at 2.

Before reviewing the merits of the petition, 28 U.S.C. § 2254(b) requires the Court to find that (A) the applicant has exhausted the remedies available in the courts of the state; or (B) there is an absence of available State corrective process, or circumstances that render such process ineffective. *Id.* The Magistrate Judge found that Mr. Hatfield appropriately raised his Constitutional arguments during his direct appeals and in his State habeas petition. *PF&R*, at 27–29. Respondent objects to the Magistrate's findings and recommendations with regard to exhaustion, specifically arguing that Petitioner waived his procedural due process claim by objecting to a psychological evaluation while the case was on remand between the West Virginia Supreme Court's decisions in *Hatfield I* and *Hatfield II*.[16] Accordingly, review of Respondent's objections is *de novo*.

28 U.S.C. § 2254(b) requires a federal court to deny a petition for a writ of habeas corpus on behalf of a state prisoner when the petitioner has failed to exhaust remedies available in state court. The United States Supreme Court has explained that "[a] corollary to the habeas statute's exhaustion requirement, the [procedural default] doctrine has its roots in the general principle that federal courts will not disturb state court judgments based on adequate and independent state grounds." *Dretke v. Haley*, 541 U.S. 386, 392 (2004).

## 1.      Adequate and Independent State Grounds

The United States Court of Appeals for the Fourth Circuit summarized the effect of the procedural default doctrine in *McNeill v. Polk*, 476 F.3d 206, 211 (4th Cir. 2007), as follows:

---

[16] The Magistrate Judge did not address this procedural default argument in the PF&R because Respondent did not raise it in briefing the motions for summary judgment. Section 2254(b)(3) provides that "[a] State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." There has been no such waiver, therefore the procedural default argument is properly preserved.

The doctrine of procedural default provides that "a federal habeas court may not review constitutional claims when a state court has declined to consider their merits on the basis of an adequate and independent state procedural rule." *Burket v. Angelone,* 208 F.3d 172, 183 (4th Cir.2000). A state procedural rule is adequate if it is regularly or consistently applied by the state courts, *Johnson v. Mississippi,* 486 U.S. 578, 587 (1988), and it is independent if it does not depend on a federal constitutional ruling, *Ake v. Oklahoma,* 470 U.S. 68, 75 (1985). Where a state procedural rule is both adequate and independent, it will bar consideration of the merits of claims on habeas review unless the petitioner demonstrates cause for the default and prejudice resulting therefrom or that a failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson,* 501 U.S. 722, 750 (1991).

In *Hatfield III*, the West Virginia Supreme Court relied on two state court doctrines when it reversed the state habeas judge's decision to order Mr. Hatfield's release.  First, *Hatfield III* relied on the "law of the case" doctrine[17] in reaching the conclusion that "the habeas proceeding was *not* the first opportunity a court had to address whether the defendant's due process rights were violated when the trial court determined his mental competency without holding a full evidentiary hearing on the issue."  *Hatfield III*, 671 S.E.2d at 463.  Second, *Hatfield III* invoked the "invited error" doctrine[18] and declined to consider the merits of Mr. Hatfield's constitutional claim because, as the court explained, "the error, if any, was created by the defendant in his refusal to participate in further psychological testing."  *Hatfield III*, 671 S.E.2d at 464.

In order to determine whether Petitioner procedurally defaulted on his claim, the Court must decide whether either of the two state law doctrines invoked by the West Virginia Supreme Court

---

[17] The law of the case doctrine generally prohibits reconsideration of issues which have been decided in a prior appeal in the same case.  *Hatfield III*, 671 S.E.2d at 463 (*citing* Am. Jur. 2d Appellate Review § 605 at 300 (1995)).

[18] The invited error doctrine generally prohibits a litigant from silently acquiescing, or actively contributing to an error, and then raising it as a reason for reversal on appeal.  *Hatfield III*, 671 S.E.2d at 464 (internal citations omitted).

is an adequate and independent state ground.  If either ground is both adequate and independent, the Court must deny the petition unless the Petitioner can show cause and prejudice, or if the case falls into the limited exception applicable to an "exorbitant application of a generally sound rule" described in *Lee v. Kemna*, 534 U.S. 362 (2002), and discussed in more detail below.

### a.    Law of the Case

The Court can rather quickly dispense with the law of the case doctrine as an adequate and independent state ground sufficient to bar review.  In order to be independent, the application of this doctrine cannot depend on a particular construction of federal law or otherwise be "interwoven with the federal law." *Michigan v. Long*, 463 U.S. 1032 (1983).  In this section of *Hatfield III*, the West Virginia Supreme Court stated, "[i]n summary, this court in *Hatfield II* found that the circuit court made the necessary inquiry directed by *Hatfield I*.  Consequently, this Court concluded that the lower court followed this Court's directive on remand and did not deny the defendant his due process rights in doing so." *Hatfield III*, 671 S.E.2d at 462 (internal citations omitted).  After invoking the law of the case, the court continued:

> [T]he habeas corpus proceeding was *not* the first opportunity a court had to address whether the defendant's due process rights were violated when the trial court determined his mental competency without holding a full evidentiary hearing on the issue. The circuit court's conclusion that it could address the defendant's due process claims in the habeas action is clearly wrong in light of the record and of the previous considerations in the previous reviews of the Hatfield cases.  Implicit and explicit in *Hatfield I* and *Hatfield II* was this Court's concern with whether due process protections were implemented in accepting the defendant's guilty plea. Such a determination necessarily included an analysis of the defendant's competency at the time he entered the guilty plea.  Thus, the circuit court in the habeas corpus proceeding was bound by the decisions previously reached by the circuit court in the criminal proceeding, which were affirmed by this Court. The circuit court in the habeas proceeding was without authority to address the issue of the defendant's competency at the time he entered his guilty plea.

*Id.* at 463 (internal citations omitted).  It is plain that the West Virginia Supreme Court's application

of law of the case doctrine required construction of their prior opinions and of the application of the

Due Process Clause of the Fourteenth Amendment.  As such, it is not an independent state ground.

        **b.**    **Invited Error**

      The Fourth Circuit noted in *Wilson v. Ozmint*, 357 F.3d 461, 466 (4th Cir. 2004), that the

invited error doctrine in South Carolina is an adequate and independent state ground for procedural

default purposes.  Like South Carolina, West Virginia adheres to the invited error doctrine.  *See*

*Maples v. West Virginia Dep't of Commerce, Div. of Parks and Recreation*, 475 S.E.2d 410, Syl.

Pt. 1 (W. Va. 1996) ("A litigant may not silently acquiesce to an alleged error, or actively contribute

to such error, and then raise that error as a reason for reversal on appeal.")  To be adequate, West

Virginia's invited error doctrine "must have been firmly established and regularly followed by the

time as of which it is to be applied."  *Ford v. Georgia*, 498 U.S. 411, 424 (1991) (internal citation

omitted).  It is independent if it does not depend on a federal constitutional ruling.  *Ake v. Oklahoma,*

470 U.S. 68, 75 (1985).  The invited error doctrine was firmly established and regularly followed

in West Virginia well before any of the conduct involved in this case.  *See, e.g.*, *William James Sons*

*Co. v. Hutchinson*, 90 S.E. 1047, 1048 (W. Va. 1916) ("Error invited precludes complaint on appeal

by the party provoking the error."); *Wood Cnty. Bank v. King*, 89 S.E.2d 627, 631 (W. Va. 1955)

("Invited error . . . is not a ground for reversal."); *State v. Riley*, 151 S.E.2d 308, Syl. Pt. 21 (W. Va.

1966) ("A judgment will not be reversed for any error in the record introduced or invited by the

party asking for the reversal.").  Moreover, nothing about West Virginia's invited error doctrine

indicates that it is contingent on a federal constitutional ruling.  Thus, the Court finds that invited

error doctrine is generally an adequate and independent state ground, but the question remains whether its application is adequate in this case.

In this regard, the United States Supreme Court has recognized a limited category of "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna*, 534 U.S. 362, 376 (2002); *Osborne v. Ohio*, 495 U.S. 103 (1990). *Kemna* found the application of a generally sound rule to be exorbitant and therefore inadequate where (1) the Petitioner substantially complied with the rule, (2) no published state court decision required perfect compliance with the rule, and (3) perfect compliance would not have changed the state court's decision. *Kemna*, 534 U.S. at 387; *see also Hedrick v. True*, 443 F.3d 342, 362 (4th Cir. 2006) (Discussing *Kemna*).

The Court concludes that the circumstances of this case are sufficiently exorbitant to render the invited error doctrine an inadequate bar to Petitioner's claim. In *Kemna*, the defendant's alibi witnesses left the courthouse during trial after being erroneously informed by courthouse personnel that they would not be needed until the next day. Without his alibi witnesses, the defendant was unable to put on his planned defense and moved for a continuance. The trial judge denied the request because he had other plans the next day (a Friday) and already had another trial scheduled for the following Monday. *Kemna*, 534 U.S. at 369. In post-conviction proceedings, the State relied on a procedural rule requiring a motion for a continuance to include a showing of materiality and a statement that the witness' absence was not due to the defendant's own procurement. *Id*. at 371–72. Relying on the three factors laid out above, the United States Supreme Court found this to be an exorbitant application which rendered the rule inadequate to bar consideration of the petitioner's federal constitutional claim. *Id*. at 376–87.

Here, this case has been before the West Virginia Supreme Court a total of three times. *Hatfield I* and *Hatfield II* were direct appeals from the trial court. *Hatfield III* was an appeal from the state habeas court which set aside Mr. Hatfield's convictions and ordered a new trial. *Hatfield III*, 671 S.E.2d at 455. The potential invited error occurred in 1996, during the remand between *Hatfield I* and *II*. As a result of *Hatfield I*, the trial judge ordered a new competency evaluation to determine both present competency (as of 1996) and, if possible, past competency (as of 1989). ECF No. 7-4, at 39–41. Petitioner objected to the retrospective competency evaluation, but the judge ordered both evaluations anyway. *Id*. From a review of the transcripts, particularly the excerpts cited *supra* at § II.B.2, it is apparent that the constitutional error, denial of a competency hearing, was in no way invited by Petitioner. To the extent that Mr. Hatfield claimed a due process right to a competency evaluation in 1996, the objection expressed in Mr. Morrone's letter may well have procedurally defaulted his right to such an evaluation. His claim here, properly preserved, is not that he was deprived of an evaluation but rather that he never received a hearing at which he could present evidence and cross-examine witnesses.

Judge Maynard acknowledged Mr. Morrone's letter as a source of confusion. *Resp's Ex. 18*, ECF No. 7-4, at 78–80 ("There may have been some way to resolve this case if that procedure had been followed, but this attorney [Mr. Morrone] thwarted that effectively.") In fact, the Order and transcript reveal that Petitioner agreed to and actively sought an evaluation of his competency in 1996, in accordance with the West Virginia Supreme Court's opinion in *Hatfield I*. At that telephone conference Judge Maynard speculated, contrary to the representations of counsel, that allowing the evaluation would be to invite error. *Id*. at 54 (Judge Maynard stated, "I'm not going to let him create error in this record by now submitting to an evaluation by a doctor he says he

objects to and has strong objections to and let him subsequently enter some plea he's going to attack because when he's got his next set of lawyers, when he says you fellows let him down."). A review of that transcript, and of the Order preceding it, indicates that all parties agreed upon an evaluation of present competency (as of 1996) but that Mr. Hatfield, and his lawyers, objected to an attempted retrospective competency evaluation. That Petitioner may not have understood exactly what *Hatfield I* required should come as no surprise, particularly since the trial judge, counsel, two subsequent opinions of the West Virginia Supreme Court, one West Virginia habeas court and a federal Magistrate Judge have all disagreed as to the import of that opinion in the two decades since it was first written. In *Hatfield II*, the West Virginia Supreme Court adopted Judge Maynard's view that development of the record was sufficient to satisfy *Hatfield I*. Accepting this at face value, nothing about *Hatfield II* justifies the ongoing failure to hold a hearing at which Mr. Hatfield could present evidence on the issue of competency.

Looking to the factors in *Kemna*, Petitioner here sought to avoid inviting error by agreeing to the competency evaluation. Perfect compliance with the initial order directing evaluation would not have changed the outcome as Judge Maynard appeared determined to reaffirm the initial outcome and to avoid any course of action that might allow Petitioner a second opportunity to plead.[19] The circumstances in the case at bar represent an exorbitant application of the invited error doctrine sufficient to render it an inadequate bar to Petitioner's claim. Therefore, the Court **FINDS** that there was no procedural default because of the exorbitant circumstances in which the doctrine was applied.

---

[19] As noted *supra* at § II.B.2, Judge Maynard asked Mr. Hatfield at the remand hearing whether he wanted to withdraw his plea and stand trial, to which Mr. Hatfield responded, "Yes, I do, your Honor."

2.        **Cause and Prejudice**

Even where a claim would ordinarily be barred by an adequate and independent state procedural rule, a procedural default can be excused where the petitioner can show both cause for the default and actual prejudice. *Coleman v. Thompson*, 501 U.S. 722, 747–50 (1991).  For reasons similar to those discussed in the preceding section, Mr. Hatfield can show cause for the default.  The confusion over the meaning of *Hatfield I*, the letter from Mr. Morrone, and Judge Maynard's determination resulted in the cancellation of the competency evaluation.  Even if Mr. Hatfield defaulted any claim for a competency evaluation in 1996, responsibility for the failure to hold a constitutionally adequate competency hearing lies squarely with the court.  It simply cannot be said that the failure to hold an adequate competency hearing was in any way caused by the Petitioner. Whether or not a new evaluation was conducted, the trial court still had an obligation to hold an evidentiary hearing on the issue of Mr. Hatfield's competence.

The United States Supreme Court has held that, in order to show prejudice, a petitioner must show that there was a reasonable probability of a different result absent the violation.  *Strickler v. Greene*, 527 U.S. 263, 291 (1999).  In this context, the invited error doctrine was invoked to reverse the state habeas court's grant of the writ, and unquestionably changed the outcome of that proceeding.  Accordingly, Petitioner has no difficulty showing both cause and prejudice for the alleged procedural default. As an alternative basis for this decision, the Court **FINDS** that any procedural default is excused because Petitioner can show cause for the default and prejudice. Having concluded that Petitioner's claim is not barred, the Court turns now to Petitioner's Constitutional claim.

**B.    The Decisions of the Courts of the State of West Virginia were Contrary to Clearly Established Federal Law as Determined by the Supreme Court of the United States[20]**

This case is complicated by the fact that the Constitutional error complained of by Petitioner, failure to hold a competency hearing that comports with the fundamental requirements of due process, occurred very early, at a pre-trial competency hearing, and the trial judge had at least two opportunities to remedy the initial error: first, on the date set for trial, when the trial judge assessed Petitioner's competency before accepting his guilty plea; and second, on remand when the trial judge unreasonably applied *Hatfield I* and affirmed Petitioner's conviction over his not guilty plea.  The plea and remand hearings both presented the trial judge with an opportunity to rectify the original error, but he failed to do so.  Before turning to these individual events, it is necessary to describe the "clearly established federal law as determined by the Supreme Court of the United States" with regard to the triggering and conduct of a competency hearing. 28 U.S.C. § 2254(d).

**1.    Clearly Established Federal Law**

The test for competency to stand trial is well-established:

> [I]t is not enough for the district judge to find that the defendant is oriented to time and place and has some recollection of events, but that the test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a rational as well as factual understanding of the proceedings against him.

*Dusky v. United States*, 362 U.S. 402, 402 (1960) (internal quotations omitted).  It is axiomatic that the conviction of an accused person while he is legally incompetent violates due process and that

---

[20]Though Respondent concedes that a constitutionally adequate competency hearing has never been held, 28 U.S.C. § 2254 authorizes a narrow scope of review which requires the Court to review the merits of Mr. Hatfield's constitutional claim without relying on Respondent's concession. *See Gardner v. Galetka*, 568 F.3d 862, 878–79 (10th Cir. 2009), *cert denied* 2010 WL 757724 (U.S. 2010) ("the standard of review under AEDPA cannot be waived by the parties.").

states must implement constitutionally adequate procedures to protect this right. *Pate v. Robinson*, 383 U.S. 375, 378 (1966) (*citing Bishop v. United States*, 350 U.S. 961 (1956)). Similarly, a potentially incompetent defendant may not knowingly or intelligently waive his right to have the court determine his capacity to stand trial, *Id*. at 384, and "the failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." *Drope v. Missouri*, 420 U.S. 162, 172 (1975). This obligation does not end with a pre-trial competency hearing. "Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Id*. at 182. Finally, the standard for competency to stand trial and the standard for competency to enter a guilty plea are the same, though a court accepting a guilty plea must also undertake a sufficient inquiry to ensure that a defendant is knowingly and voluntarily waiving his trial and other Constitutional rights. *Godinez v. Moran*, 509 U.S. 389, 397–401 (1993).

Though the United States Supreme Court has not described the precise procedures mandated by the Constitution, it has specifically held that a "defendant's demeanor at trial," and "mental alertness and understanding displayed in . . . colloquies with the trial judge . . . cannot be relied on to dispense with a hearing on [the issue of competency]." *Pate*, 383 U.S. at 385–86. When Mr. Hatfield entered his pleas, less than two weeks after his most recent suicide attempt, Judge Maynard heard no new psychiatric evidence and instead relied entirely on Mr. Hatfield's demeanor and a colloquy in finding Mr. Hatfield competent to plead guilty. The *Pate* Court indicated that compliance with the applicable Illinois statute, which requires the judge to conduct a sanity hearing sua sponte where the evidence raises a "bona fide doubt" as to a defendant's competence, would

satisfy the Constitution.  *Id.* at 385.  In *Drope*, the Court similarly approved of Missouri's statute

which required, *inter alia*, "that the trial court hold a hearing if the opinion relative to fitness to

proceed . . . is contested."  *Drope*, 420 U.S. at 174.  Like the Illinois and Missouri statutes in *Pate*

and *Drope*, West Virginia Code §§ 27-6A-1–2  jealously guard a defendant's right to a fair trial.

*See supra* note 3.

2.     **The Initial Competency Hearing**

On January 27, 1989, the trial judge convened a hearing to determine Petitioner's

competency to stand trial.  ECF No. 28-6, at 2.  After being told by the Prosecutor that the State's

expert, Dr. Ralph Smith, expected to complete a report within ten days that would find Petitioner

competent to stand trial, the Court declared Petitioner competent to stand trial.  *Id.* at 3–4.  This

initial hearing lacked all the essential elements that are fundamental to due process:  Petitioner had

no opportunity to cross-examine the State's sole expert, to offer evidence, or to rebut or impeach

opposing evidence.  Incredibly, the Court relied on a letter from Dr. Smith referencing his report

which had not yet been written but which was expected to be completed in the near future.  At the

end of this hearing, the trial judge instructed the Prosecutor to draft an order finding Petitioner

competent to stand trial and setting a date for trial in February.  *Pet's Ex.* 6, ECF No. 28-6.[21]  As in

---

[21]That Order left open the possibility of a future competency hearing in accordance with
West Virginia law. *Pet's Ex. 11*, ECF No, 28-11. Though the record is not clear, it appears that the
Court intended to permit defense counsel to request a proper hearing once the State's psychologist
disclosed his full report. The report was disclosed shortly before trial, and the trial judge denied
defense counsel's request for a continuance based on the late disclosure. *Resp's Ex. 16*, ECF No. 19-
3, at 3–5. This Order does not vitiate the trial court's failure to hold a constitutionally adequate
competency hearing. As the West Virginia Supreme Court recognized in *Hatfield I*, the Court's
knowledge of Mr. Hatfield's suicide attempt after the "competency hearing" but before trial
triggered a duty to revisit the issue of competency before allowing Petitioner to plead guilty or stand
trial.

*Pate* and *Drope*, the trial court's failure to abide by State law is relevant, but a federal habeas petition can be granted only based on violations of clearly established federal law. Like the Supreme Court, this Court need not define the constitutional floor for the conduct of a competency hearing. It is sufficient for these purposes to find that Petitioner's procedural due process rights were violated by the trial court's failure to provide Petitioner with an opportunity to present evidence, cross-examine witnesses, or challenge his competency in any meaningful way.

### 3.     Plea Hearing

After the initial competency hearing and before his trial date, Petitioner attempted suicide for a second time. Petitioner's case was set for trial on February 27, 1989, approximately ten days after the most recent failed suicide attempt. That morning, out of the presence of potential jurors, defense counsel advised the court and the Prosecutor that Mr. Hatfield wished to solicit a plea against their advice. *Resp's Ex. 16*, ECF No. 19-3, at 17. The record reflects that Petitioner hoped the Prosecutor would agree to recommend a sentence of life with mercy.[22] *Id.* A portion of the plea discussions, in which the trial judge participated, was transcribed by the court reporter. *Id.* at 17–24. After a recess, the parties reconvened in chambers, where defense counsel reiterated their belief that Mr. Hatfield's desire to plead guilty was another suicide attempt and was contrary to their advice. They also informed the Court that two of Petitioner's treating doctors believed that Petitioner was not competent to enter a plea. *Id.* at 24–26. While still in chambers, the trial judge engaged in a conversation with Petitioner in order to assess his competency. At the end of this discussion,

---

[22] In West Virginia, a defendant convicted of first degree murder receives a mandatory life sentence. W. Va. Code. § 62-3-15. However, a recommendation of mercy by the jury or, in the event of a plea, by the judge, makes the defendant eligible for parole after serving a certain number of years. Before 1994, a defendant sentenced to life with mercy was eligible for parole after serving ten years. In 1994, this was extended to fifteen years. *Id.*

defense counsel reiterated their belief that Petitioner was not competent to enter a plea and represented to the Court that his treating physicians believed Petitioner's insistence on pleading guilty to be another suicide attempt. *Id.* at 26–48. Finally, in open court, the trial judge engaged in a lengthy colloquy with Petitioner and established a factual basis for Petitioner's plea. *Id.* at 52–113. After defense counsel reiterated their concerns, the Court found Petitioner competent and accepted Petitioner's guilty plea. *Id.* at 113.[23]   Contrary to *Pate*, Judge Maynard relied entirely on his colloquy with Mr. Hatfield at the plea hearing despite a recent suicide attempt and overwhelming evidence suggesting incompetence. In December of that year, the trial judge sentenced Petitioner to life in prison without mercy.

Respondent's initial objections to the Magistrate Judge's PF&R relied heavily on this plea to support the argument that the decisions of the various state courts were not contrary to clearly established Federal law as determined by the Supreme Court of the United States. In so doing, Respondent reiterated his argument that Judge Maynard found Petitioner competent and that this determination benefits from a presumption of validity which Petitioner can overcome only by clear and convincing evidence the decision was an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(e). At oral argument, however, the Respondent abandoned this objection and agreed with Petitioner that a constitutionally adequate competency hearing was never held. In so doing, the Respondent recognized the central point of Petitioner's argument and of the Magistrate Judge's proposed findings: The issue is not Petitioner's competency but rather the failure to afford him a constitutionally adequate hearing prior to making that determination. *Pate, Drope*, and *Medina* make it very clear that the Due Process clause requires the State to provide a criminal defendant with

---

[23] For additional discussion of the plea hearing, see *supra* at § II.A.3.

"a reasonable opportunity to demonstrate that he is not competent to stand trial." *Medina*, 505 U.S. at 451.

As of the date of the plea hearing, no constitutionally adequate competency hearing had been held. Even if the initial hearing had been constitutionally sufficient (which it unquestionably was not), the combination of (1) Petitioner's intervening suicide attempt, (2) his desire to plead guilty against the advice of counsel, and (3) counsels' proffers that Mr. Hatfield's treating physicians believed his desire to plead guilty to be another attempt at suicide, all raised serious doubts as to Petitioner's competency on that day. The recent suicide attempt triggered a new obligation to inquire into Petitioner's competency; the plea hearing also presented Judge Maynard with an opportunity to remedy his prior error and afford Petitioner an adequate hearing. By failing to do so, the trial judge abdicated his constitutional responsibility to avoid convicting a potentially incompetent defendant. This decision was contrary to clearly established federal law as described *supra* at § III.B.1 and entitles Petitioner to relief under 28 U.S.C. § 2254(d)(1).

Additionally, Petitioner has satisfied his burden under §§ 2254(d)(2) and (e)(1). As the West Virginia Supreme Court recognized in *Hatfield I*, "genuine attempts at suicide constitute evidence of irrational behavior. When these acts are brought to the attention of a trial judge, he should order a psychiatric evaluation of a defendant." *Hatfield I*, 413 S.E.2d 162, Syl. Pt. 3 (citing *State v. Watson*, 318 S.E.2d 603 (W. Va. 1984) (citing *Drope*, 420 U.S. 162 (1975) and *Pate*, 383 U.S. 375 (1966)). Judge Maynard found Petitioner competent based solely on a colloquy with Mr. Hatfield and in total disregard of the proffers of counsel and the undisputed suicide attempt. This is clearly unreasonable in light of the evidence presented at that time and directly contrary to the United States

Supreme Court's holding in *Pate* that "colloquies with the trial judge . . . cannot be relied on to dispense with a hearing on [the issue of competency]."  *Pate*, 383 U.S. at 385–86.

### 4.    *Hatfield I* - **Petitioner's First Direct Appeal**

Petitioner appealed the trial court's sentence and raised his procedural due process claim before the West Virginia Supreme Court at that time.  The Court, however, did not reach that issue because it concluded, as has this Court, that the circumstances of Petitioner's plea hearing required an additional inquiry before accepting a plea.  *See supra* § II.B.1.  Having already addressed the constitutional shortcomings of the initial competency hearing, it is not necessary to reiterate them here.  To the extent that *Hatfield I* affirms those proceedings, it is contrary to clearly established constitutional law described *supra* at § III.B.1.[24]

### 5.    **Remand Hearing**

On December 11, 1996, the trial judge entered an Order directing that Petitioner be evaluated to determine his competency to enter a plea at that time and, if possible, his competency at the time he entered his pleas in 1989.  *Resp's Ex. 18*, ECF No. 7-4, at 39–41.  As discussed *supra* at § II.B.2, Petitioner initially objected to a retrospective competency evaluation, but withdrew that objection through counsel at a telephone conference held two days later.  *Resp's Ex. 19*, ECF No. 7-4, at 51. The trial judge then cancelled the previously ordered evaluation and held a hearing on December 19, 1996, in an effort to comply with the Opinion of the West Virginia Supreme Court.  *Resp's Ex. 20*, ECF No. 7-4, at 58.  At that hearing, the judge asked Petitioner's original counsel of their

---

[24]As the Magistrate Judge noted, the language in 28 U.S.C. § 2254(d) that requires a habeas claim be "adjudicated on the merits" does not bar claims raised and not decided, or decided in a summary fashion. *Thomas v. Taylor*, 170 F.3d 466, 475 (4th Cir. 1999) (collecting cases).  That the West Virginia Supreme Court decided Petitioner's case on other grounds does not bar consideration of the claim since it was properly preserved.

reasons for opposing the plea. *Id*. at 67–72. After the defendant acknowledged that he understood

his counsel, the judge inquired as to whether Mr. Hatfield still desired to plead guilty. Mr. Hatfield

stated unequivocally that he desired to plead not guilty and to stand trial. *Id*. at 73–74; *see also*

*supra* § II.B.2.

      Based on his attorneys' statements and Petitioner's stated desire to stand trial, Judge

Maynard found Mr. Hatfield presently competent and retrospectively competent at the time of his

1989 plea, and reaffirmed both the original plea and his original sentence of life without mercy.[25]

Judge Maynard's 1996 determination of Petitioner's competency in 1989 suffers from the same

inadequacies as the judge's prior competency determinations, and then some. Only a week earlier,

Judge Maynard had entered an Order directing the State's psychiatrist, Dr. Ralph Smith, to

"determine, if possible, from the records and transcripts, whether Defendant was competent to enter

his plea of Guilty on December 6, 1989." *Resp's Ex. 18*, ECF No. 7-4, at 39. To subsequently

cancel that evaluation and make a retrospective competency determination without the benefit of

*any new evidence whatsoever* is a clear violation of the mandate of the West Virginia Supreme

Court, a failure to use this opportunity to remedy the original and ongoing violation, and a

continuation of the earlier and ongoing violation of clearly established federal law as determined by

the Supreme Court of the United States.

      At the conclusion of this hearing, Judge Maynard reflected on the prior proceedings in this

case. First, he opined about the completeness of the plea colloquy. Then, he proceeded to describe

---

[25]While the record reflects no dispute as to Mr. Hatfield's competency in 1996, his
competency at that hearing was only relevant to his capacity to enter a plea at that time. Petitioner
clearly and unequivocally indicated his desire to plead not guilty, a desire to which Judge Maynard
paid no heed.

the "great lengths" to which the court had gone in examining Petitioner's competency, including "review[ing] all the psychological and psychiatric reports." *Resp's Ex. 20*, ECF No. 7-4, at 76.  This statement is simply not supported by the record, where it is clear that Judge Maynard found Petitioner to be competent without waiting for the State's psychiatrist to complete a report, without regard to West Virginia statutes governing the conduct of competency hearings, and without affording Petitioner even the most basic protections of due process.  At least one psychiatric report, that of Dr. Gallemore, was apparently not made part of the record until Petitioner was sentenced. *Resp's Ex. 17*, ECF No, 7-4, at 8–10.  Judge Maynard's statement that "I don't know of any way to more completely, and to more fully, to more accurately gauge an individual's competency than the manner in which it was gauged in this case at the time this man entered his plea," is astounding. *Resp's Ex. 20*, ECF No. 7-4, at 77–78.  West Virginia Code § 27-6A-2 (1983) describes in detail the procedures to be followed when a criminal defendant's competency is at issue.  This statute was cited by Petitioner in his initial motion to set a hearing and by the West Virginia Supreme Court when it remanded the case.  *Hatfield I*, 416 S.E.2d at 165.  It is West Virginia's method of ensuring that criminal proceedings in the State comport with the basic requirements of due process, and it was completely ignored.  Judge Maynard proceeded to give a self-described "sermon" about the American judicial system which touched on the public perception of criminal courts, Mr. Hatfield's legal skills and the horrors of his crimes, and the judge's view that the West Virginia Supreme Court remanded the case because it was upset with the sentence that he imposed.  *Resp's Ex. 20*, ECF No. 7-4, at 80–85 (By Judge Maynard, "That is what [*Hatfield I*] is about.  This is appellate sentencing.  That's what this amounts to.").  In light of the foregoing, this Court concludes that Petitioner has satisfied his burden under § 2254(d)(2) and (e)(1).  Judge Maynard's present and retrospective

-43-

competency determinations at this fundamentally flawed hearing were unreasonable determinations of the facts in light of the evidence then presented.

### 6.    *Hatfield II*

In the *per curiam* opinion discussed in detail *supra* at § II.B.3, three justices in *Hatfield II* affirmed the remand proceedings by characterizing *Hatfield I* as a remand to develop the record and not a reversal of the original convictions.  The two dissenting Justices (along with the affidavit from former Justice Neely) accurately noted that "[n]o competency hearing has ever been held regarding [Petitioner].  It is axiomatic that the conviction of a legally incompetent defendant or the failure of the trial court to provide an adequate competency determination violates due process by depriving the defendant of his constitutional right to a fair trial." *Hatfield II*, 522 S.E.2d at 421 (Starcher, C.J., dissenting).

While the Court accepts the majority opinion in *Hatfield II*, it cannot avoid the conclusion that this decision once again denied Petitioner his clearly established constitutional right to a fair competency hearing.  By narrowly construing *Hatfield I* to require nothing more than a remand for development of the record, *Hatfield II* affirmed the constitutionally inadequate proceedings that led to the second appeal.  In so doing, the West Virginia Supreme Court once again deprived Petitioner of his right to a fair competency hearing.  *Hatfield II* is contrary to clearly established federal law as determined by the Supreme Court of the United States.

### 7.    **State Habeas and *Hatfield III***

Admirably, Judge Hoke recognized the injustice of the proceedings up to this point and sought to rectify the situation.  The facts of these proceedings were already discussed in great detail *supra* at §§ II.B.4 and 5, and the West Virginia Supreme Court's holding was analyzed in the

procedural default portion of this opinion *supra* at §§ III.A.1 and 2.  The Court will revisit *Hatfield III* here only to reiterate that, to the extent that it affirms the constitutionally inadequate processes that lead up to this appeal, *Hatfield III* is contrary to clearly established federal law as determined by the Supreme Court of the United States.

### IV.  Potential for Retrospective Competency Determination

The Court's conclusion raises the issue of the appropriate relief at this time, after more than two decades of incarceration without a constitutionally adequate competency hearing.  The Magistrate Judge found that a retrospective determination of Petitioner's competency at the time that he entered his guilty pleas would not be possible due to the passage of more than 23 years combined with the lack of contemporaneous evidence in the record regarding his competency at that date or the experience and standards of the experts who examined him.  *PF&R*, at 46–50.  Accordingly, she recommended that Mr. Hatfield's petition be granted and his conviction set aside.  *Id*.  The Respondent voiced no objection to this conclusion and, in response to the Court's inquiry at oral argument, Respondent indicated that the State did not intend to attempt an evaluation, 23 years after the fact, of Petitioner's competency at the time that he entered his pleas.

While the Magistrate Judge's analysis and Respondent's statement at oral argument are persuasive, the Court need not decide at this time whether a determination of Mr. Hatfield's competency at the time he entered his guilty pleas is constitutionally permissible.  The Court notes that, should Mr. Hatfield be tried and defend on the ground that he was not competent at the time of the murders, a court and jury may be required to engage in a retrospective evaluation of his criminal responsibility.  While a competency determination at this late date would undoubtedly raise

constitutional concerns, the issue to has not been sufficiently briefed and is not essential to this Opinion. The Court **DECLINES to adopt** the Magistrate Judge's proposed finding in this regard.

### V. Conclusion

Petitioner's claim is not barred. This case satisfies both the exorbitant circumstances exception laid out in *Lee v. Kemna*, 534 U.S. 362 (2002) and the more traditional "cause and prejudice" exception, *Coleman v. Thompson*, 501 U.S. 722 (1991). Having considered the briefs, heard oral argument, and reviewed de novo the portions of the Magistrate Judge's Proposed Findings and Recommendations to which objections were raised, the Court hereby **ADOPTS in part** the Proposed Findings and Recommendations. Petitioner's Motion for Summary Judgment (ECF No. 28) is **GRANTED**. Respondent's Motions for Summary Judgment (ECF No. 7 and 19) are **DENIED**. Petitioner's petition for Writ of Habeas Corpus (ECF No. 1) is **GRANTED**; Petitioner's conviction is hereby set aside. The Respondent is **ORDERED** to discharge Mr. Hatfield unless the State of West Virginia elects to try him in a timely fashion. The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.


ENTER:      July 10, 2012


ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE